First District.

DENIS
*vs.*
LECLERC.

*Febrero,* speaking of general renunciations, says, they are absurd, and tend only to introduce error and confusion.

THIS point was also determined, in a judgment rendered in this city, when under the dominion of Spain, July 13th 1803, in the case of *Fletcher* vs. *Piernas.*

As we are of opinion, that the renunciation ought to have been special, it is unnecessary to inquire, whether the wife ought not to have been authorised.

JUDGMENT FOR THE DEFENDANT.

———✷———

*DENIS* vs. *LECLERC.*

ATTACHMENT for contempt. The original petition stated that the defendant having, by improper means, obtained a letter, written by the plaintiff to a third person, was preparing to publish it, with indecent commentaries : and prayed for an injunction staying the publication, which was granted *as to the letter.*

The receiver of a letter has no right to publish it, in spight of the writer.

ON the following day, the defendant filed his answer to which was annexed a copy of the letter, denying that he obtained it through improper means, and averring it had been sent to him, by the person to whom it was directed. The court thought it proper to sustain the injunction till the hearing.

PP

SPRING 1811.
First District.

DENIS
*vs.*
LECLERC.

THE defendant, a few days after this decision, inserted an advertisement in a newspaper, inviting all persons, who might be desirous to see the letter, to go to the clerk's office, where a copy was annexed to his answer, or come to his printing-office, where one was stuck up for public inspection.

ON an affidavit of these facts, the plaintiff moved for and obtained process of attachment for a contempt of the authority of the court, and a disobedience to the injunction : on the return of the process, the defendant admitted the publication of the advertisement, but denied that any copy, or the original of the letter, was stuck up in his office : and a witness who was introduced and examined *viva voce*, by consent, deposed, that he had called at the office for a sight of the letter, and was taken into a private room, where it was shown to him, with an injunction of secrecy : and that, to his knowledge, another person had been indulged with the reading of it.

THE case was argued by *Alexander*, *Depeyster* and *Smith*, for the plaintiff, and *Morel* and *Wilson* for the defendant. Mr. *Blanque*, a lay gentleman was, with the consent of the bar, permitted by the court to speak on that side.

*By the Court*, MARTIN, *J. alone.* Although it has been deemed improper, upon this motion, to allow the discussion of the propriety of grant-

ing the injunction, that having been gone into at large on the motion to dissolve it, I believe it advisable to detail the principles which influenced the court in declining to dissolve it before the final hearing, as these principles have been for purposes, not necessary to be now examined, industriously and eggregiously misrepresented.

THE injunction was claimed and the dissolution of it resisted on the ground,

1. That a letter is an object of property :

2. That, after the person to whom it is directed receives it, the property of the writer still continues in it, to a certain degree. The former having only therein a joint property with the latter :

3. That the right of publishing it, remains exclusively in the writer, until he abandons it, and at his death passes to his representatives :

4. That the property of the writer may be violated, by multiplying copies of, or suffering the letter to be used contrary to his presumed intention.

I. A letter is an object of property.

THERE is nothing that a man may so emphatically call his own, or more incapable of being mistaken, than his ideas thrown upon paper, his literary works. 4 *Burrows* 2345. *Millar* vs. *Taylor.*

ACCORDING to the laws of France, a letter is recognised as a chattel, which may be the ob-

SPRING 1811.
First District.

DENIS
*vs.*
LECLERC.

ject of larceny. An action lies, and even a criminal prosecution may be instituted, against a person who, having undertaken to carry a letter, violates his trust and detains it. *Il y a action en justice, et même on peut prendre la voie extraordinaire, contre celui qui s'étant chargé de porter une lettre, ne s'est point acquitté de son message et la retient.* 3 *Collection de Jurisprudence.* 312.

AT Rome, an unfaithfull messenger, detaining a letter, was prosecuted as for forgery. *Nuntius non restituens litteras ei, cum mandatum restituere susceperit, incidit in crimen falsi* *Bartolus in lege Titio* 36, *n.* 3.

IN the United States by an act of Congress, it is made penal to print the manuscript of another, and the property of the writer is secured from invasion. 1 *Laws, U. S.* 118.

THIS act is expressly extended and declared to be in force and effect in this territory. 7 *Laws U. S.* 117.

II. The second proposition was expressly recognised by Lord Hardwicke, in the case of *Pope* vs. *Curl,* in which the plaintiff complaining, that the defendant was about publishing letters which he, the plaintiff, had written to several persons, obtained an injunction to stay the publication.

THE Lord Chancellor holding that " the re-" ceiver of a letter has at most a joint property

" with the writer and the possession does not " give him a licence to publish it." To the authority of this decision, invoked by the plain- tiff, the defendant has objected that the British Chancellor spoke only of letters, as objects of literary value, written for the purpose of raising money by a sale : but the plaintiff's counsel has drawn the attention of the court to the latter part of the case, from which it appears that the letters which *Curl* was about to publish, were *only letters on particular subjects and inquiries about the health of friends.* 2 *Atkins* 341. Foiled in this way, the defendant has insisted, that from the reputation of *Pope*, an illustrious writer, even letters of this kind might be considered as va- luable, as those of ordinary persons on scientific subjects : and that the case of *Pope* vs. *Curl*, is a solitary one, which must not be made to cont- rol others out of its species, and the present plain- tiff, altho' a lawyer, being no author, ( the letter being clearly written without a view to publication, ) cannot identify himself with the plaintiff in the case cited. This objection has been met by the production of a case in which lord Apsly, extended the same principle to letters written by Lord Chesterfield, a nobleman from whose pen nothing had yet been given to the world, but some parliamentary speeches. *Am- bler* 737.

On this second proposition, therefore, the court could not help saying, (without binding

SPRING 1811.
First District.

DENIS
*vs.*
LECLERC.

itself, as to the final opinion, it will have to pronounce on the hearing) that the person to whom the plaintiff directed his letter, had not the right of publishing it, and consequently, the present defendant could not derive it from her : notwithstanding, the letter was not written with a view to profit, nor by a person whose employment it was to write for that purpose,

III. The third point made by the plaintiff's counsel is that the right of publishing a letter remains exclusively in the writer, till he abandons it, and if not abandoned, passes at his death to his representatives. This proposition is so natural a corollary of the preceding, that it is only with a view to show that the court has attentively weighed every thing in this case, that the trouble is taken of stating it.

IT flows from a principle established in the case of *Millar* vs. *Taylor*, viz : a partial disposition, by the true proprietor of a thing, is not to be carried beyond the intent and measure of the proprietor's assent and appropriation, in that behalf, whether it be the case of borrowing, hiring or any other kind of contract or bailment. In the application of this principle to the present case, the plaintiff contends that the letter was sent, for the sole purpose of being perused by the person to whom it was directed, and therefore any other use of it, being contrary to, and beyond the intent and measure of his assent and

appropriation, is tortious and illegal, and the court ought to restrain it.

FOR this purpose, the case of *the Executors of Lord Chesterfield* vs. *Stanhope & al.* is invoked. *Ambler* 737. It differs but little from that of *Pope* vs. *Curl*, which it strongly confirms. The Earl had had a natural son, of whom the defendant Stanhope was the widow, and at whose death she became possessed of a number of letters written to him by the Earl, on education and politics ; some of which contained characters of persons in office. The lady, some time after her widowhood, mentioned the letters to the Earl and expressed her belief that, if published, they would orm a valuable system of education. His Lordship answered, " Why, that is true, but there is " too much latin in them " and did not express any disapprobation of the publication. Shortly after, he requested her to restore to him the letters containing the characters, declaring, upon his word and honor, he desired them only with an intent to burn or destroy them. She carried, accordingly, all the letters to him. He took out those which contained the characters, repeated his assurance on his word and honor, that he meant to burn or destroy them, and told her she might keep the rest. After his death, she contracted with Dodsley, the other defendant, for an edition of them. On the application of the executors of the late lord, an injuction was issued to stay the publication. The defendants insisted on the

SPRING 1811.
First District.

DENIS
vs.
LECLERC.

presumed assent of the deceased. The plain-tiffs contended, that a person has no right to print or publish letters which he receives, without the consent of the correspondent who wrote them : that his property in the letter does not extend so far, and if it did mischievous consequences would follow in abundance of cases—that the consent of the Earl, was necessary, or that of his executors, after his death—that his taking the characters and leaving the other letters in her hands, was no evidence of his consent to their being printed. Of this opinion was the chancellor, Lord Apsly.

IT is observable that the permission to publish might, perhaps, have been correctly inferred, from the want of any actual objection, on the part of the writer, when informed by one of the defendants, that she thought of a publication of his letters—from the strong and repeated asseverations, under the word and honor of the Peer, that the letters containing the characters were taken for the sole purpose of being destroyed. For those asseverations can only be accounted for, by being considered as evidence of the Lord's intention, to repel the idea that the characters were desired to be returned, with a view to any profit to be derived from them, which would unnecessarily diminish that which the lady might promise to herself from the publication hinted at.

IN this case, the chancellor recognised the principle, established by Lord Hardwicke, as the

ground of several decrees made since, in the cases of Mr. Webb, Mr. Foster and others. According to this principle, the right of publishing a letter belongs exclusively to the writer: the receiver has not such interest in it, as will enable him to prevent its publication. For Lord Hardwicke continued the injunction as to the letters written *by* Pope, but refused to continue it as to those written *to* him.

THE present case has been endeavoured to be distinguished from those cited in regard to the nature of the attempt—not to print a letter, with a view of appropriating to one's self the profit of the sale, and thus depriving the writer of the benefit secured to him by law, under the denomination of *copy right*; but with the sole view of disclosing the writer's secrets and wounding his feelings. A defendant is not to be enjoined from doing an act, on account of the benefit which he expects to derive therefrom, but on account of the injury which it may occasion to the plaintiff. Here the plaintiff complains that his property is about to be violated. Can the defendant resist the claim of the plaintiff, by saying : true it is, I am about violating your property, but I seek not thereby any pecuniary benefit, nor any advantage, but the gratuitous pleasure of working an injury? In *foro legis*, the measure of relief or damage must be the same, whether any advantage be contemplated by the wrongdoer or not—while, in *foro conscientiæ*, his turpitude is

Qq

SPRING 1811.
First District.

DENIS
*vs.*
LECLERC.

surely the greater, if none be expected. If a man is to be enjoined to print my letters, when he expects thereby to support his family, *a fortiori*, when his only view is to do me harm.

THE case is attempted farther to be distinguished, because the *subject of the injunction* is one single letter, which cannot be said to constitute a literary work. The defendant's counsel have quoted no case in support of the distinction, and the court has not been able to recollect any. Would the judges who granted the injunctions in the cases in *Ambler* and *Atkins* have permitted the letters to be printed *singly?* and if they had been thus given to the world, how could the collection of them have been prevented?

THE plaintiff having established, as far as the authorities on which he relies are entitled to respect, his right to the injunction, the defendant's counsel has replied, that the decisions of foreign judges ought not be considered as binding on the conscience of this court. This is not pretended : but the court cannot help considering the opinions of the British judges, as those of men of great learning and integrity. It is not their opinion to which the court gives its assent, but the arguments and reasons on which it is grounded. In the cases under consideration, the British court grounded its decisions upon a principle of the common law and a statute of Great Britain.

THE common law principle is this : *A par-* *tial disposition of a thing is not to be carried beyond the intent and measure of the proprietor's assent and appropriation, in that behalf.* In describing the act, we have here only an extended translation of the definition of larceny by the Roman lawyers : *Contrectatio rei alienæ, invito domino cujus illa fuit,* a diversion of the thing of another, contrary to the will of him, to whom it belongs.

IF upon this axiom Lord Hardwicke held that Curl's attempt to publish Pope's letters, ought to be restrained, because Pope by sending those letters to his friends, had made a *partial disposition* of them only, which Curl was carrying *beyond the intent and measure of Pope's assent and appropriation, in that behalf :* deciding on the civil law principle, this court must determine that the present defendant ought to be enjoined, because he is endeavouring to make *a diversion of the thing of another, contrary to the will of him to whom it belongs.*

IF in construing a British statute, made in the reign of queen Ann, for the protection of literary property, the same judge held that a letter was a literary work, against the invasion of which protection was to be extended, why should not an American judge, construing an act of congress *in pari materia,* extend the same benefit to his fellow-citizens, and hold that a

SPRING 1811.
First District.

DENIS
vs.
LECLERC.

letter is a manuscript, within the meaning of the act of congress.

IN acceding to the determinations quoted, this court keeps within the boundaries of its legitimate powers : to disregard them would be to overleap those bounds and destroy the ancient land marks. And the wife man has said : overleap not the ancient bounds which thy fathers have placed : *ne transgrediaris terminos antiquos quos posuerunt patres tui. Prov. 2.*

LASTLY it is made a subject of complaint that the injunction granted to the plaintiff prohibits the printing and publishing—while, in the cases quoted, the court only prohibited the *printing*, without restraining the defendants from publishing the contents of the letters, by other means than that of the press. Neither the statute of Ann, nor the act of congress, would authorise the extension of the injunction so far as has been done in the present case, in Great Britain or the United States. But the court has believed that, in supporting his last proposition, the present plaintiff has nearly shewn that he was entitled to this extention.

IV. This proposition is, that the property of the writer of a letter may be violated, by multiplying the copies of it, or suffering it to be used contrary to his will.

As we are examining the question, in regard to a violation of property, by a tortious use of a

letter, otherwise, than by the press, the argument
needs not to be extended to the consequences of
a multiplication of the copies.

THE plaintiff says the laws of his country, protect his correspondence ; and although this court will give damages, in case of its abuse, yet he needs not wait till the commission of the trespass, but may solicit the aid of the judges to avert it. The prevention of mischief, which should be one the principal objects of every system of jurisprudence, constitutes a very important branch of the jurisdiction of this court.

FOR this purpose, the counsel endeavours to shew that the law so much abhors the violation of a man's correspondence, that it prefers a failure of justice : and the position is supported by the following authorities.

*Pigeau*, speaking of written evidence, observes that, " Writings, which were intended to remain " secret, cannot be used—as a confession. Nei- " ther could be offered a letter written with mis- " tery and confidence : the person, who received " it, could not lawfully reveal the secrets with " which he was intrusted—nor an intercepted " letter : he, who resorts to such expedients in " order to procure testimony, ought to be pun- " ished. For *it is a* CRIME *to disturb such cor-* " *respondence, which all nations agree in consi-* " *dering as* SACRED." 1 *Procedure du Chatelet,* 225. This author considers the disclosure of the contents of a confidential communication, and

SPRING 1811.
First District.

DENIS
*vs.*
LECLERC.

the interception of a letter as acts of the same kind, which ought to be punished.

" THERE are cases, " says Denisart, *verbo* LETTRES MISSIVES, " in which the person, to " whom letters are directed, *cannot bring them* " *to light* WITHOUT CRIME ; especially when " they are written with mystery and contain con- " fidential things. *The* CRIME IS STILL GREA- " TER when the secret of a letter is unveiled *with* " *the only design of* DOING AN INJURY to the " writer, who thought he might open his heart, " without any apprehension of that being re- " vealed, which he was writing for a friend " only, and which he wished to remain concealed " from the rest of the world. The court, in " such cases, has uniformly ordered that the letter " should be restored to the writer, whatever re- " lation it might have to the object in dispute.

*Il n'est pas toujours permis de se servir des lettres missives dans les affaires ; il est des cas où celui à qui elles sont écrites, ne peut les mettre au jour sans crime, surtout lorsqu'elles ont été écrites avec mystère, et qu'elles renferment des confidences. Le crime est encore plus grand, lorsqu'on dévoile le secret d'une lettre, dans l'unique but de faire injure à celui qui en est l'auteur, et qui a cru pouvoir ouvrir son cœur, sans craindre de voir revéler ce qu'il n'écrivait que pour un ami, et ce qu'il voulait n'être sû de personne. La justice, dans ces sortes d'occasion, a*

*toujours ordonné que les lettres missives seraient*
*rendues, quelque relation qu'elles pussent avoir*
*à l'affaire. Son motif a été, que le dépot du*
*secret ayant été violé, on ne devait y avoir au-*
*cun égard.*

*Cicero,* in his second Phillipic, *in M. Anto-*
*nium,* elegantly inveighs against a person who
had shown letters, which he had written him.
" This man " says the Prince of Roman elo-
quence, " skilled in rhetoric and belles-lettres,
" yet ignorant of good manners, has produced
" letters, which he says I wrote to him. Who-
" ever, having the least ticture of civility or de-
" cency, on a misunderstanding between himself
" and his friend, ever produced or read publicly,
" the letters he had received from him ? What
" is this but to destroy the very life of society ?
" How many jokes may be indulged in, in a letter,
" which, when openly divulged, are improper !
" How many serious things proper to be com-
" municated in the privacy of one's correspon-
" dence, are unfit for the public eye....I thought I
" was writing to a citizen and a good man, not to
" a VILLAIN AND A THIEF." *At etiam litteras,*
*quas me sibi misisse diceret, recitavit, homo et*
*humanitatis expers, et vitæ communis ignarus.*
*Quis enim umquam, qui paullùm modo bonorum*
*consuetudinem nosset, litteras ad se ab amico*
*missas, offensione aliqua interposita, in medium*
*protulit palamque recitavit ? quid est aliud, tol-*
*lere è vita vitæ societatem, quàm tollere amicorum*

SPRING 1811.
First District.

DENIS
vs.
LECLERC.

*colloquia absentium ? quám multa joca solent esse in epistolis, quæ prolata si sint inepta esse videantur ? quàm multa seria, neque tamen ullo modo divulganda ?.....Quod scribam tamquam ad civem, tamquam at bonum virum; non tanquam ad* SCELERATUM ET LATRONEM.

IT would not have been easy for the plaintiff's counsel, in the various codes from which the jurisprudence of this territory draws its maxims, to have lighted upon authorities more decidedly in point. The letter it is insinuated is not written on a scientific subject : it was prepared for a lady to whom the plaintiff was paying his addresses and relates only to the object he had in view. Be it so : we are then fairly to presume it written in " mystery and confidence." Then the defendant could not produce it to light WITHOUT CRIME.

HE has not alledged, surely he has not enabled us to believe, that he had any other view than to vex the plaintiff. Then his " CRIME IS STILL " GREATER : for he seeks to unveil the secret " of a letter, with the only design of doing an " INJURY TO THE WRITER, who thought he " might open his heart, without apprehension " of that being revealed, which he was writing " for a friend only, and which he wished to re- " main concealed from the rest of the world. "

IF he were to produce such a letter, in a court of justice, for the discovery of truth, and the at-

tainment of his legal rights, Denisart informs us the judge would indignantly repel the hand that proferred it : he would order the letter to be restored to the writer, and Pigeau adds, the attempt should be punished : " for it is a crime to " disturb such a correspondence, which all na- " tions agree in considering AS SACRED."

Is it possible to believe that the law should respect the sacredness of a man's correspondence so far as to disallow its violation for a just pur- pose, the discovery of truth in the attainment of justice, and yet allow the same violation for the purpose of wanton injury ? Would the judge who would thus reject a confidential letter, and punish the person who presented it to be used in court, patiently permit the same indivi- dual to commit it to the press, to gratify his malice or revenge ?

Such is the law of France, which was in force here, on the arrival of the Spaniards. Have these, have the Americans changed it in this respect ?

It is not pretended that the Spanish code has wrought in this respect, any change in the ju- risprudence of the country : but the defendant's counsel has contended that, altho' a man's cor- respondence was thus held sacred in Rome, and is yet considered so in London, Paris and Ma- drid, it must be otherwise in the United States. Their constitution has virtually repealed all the provisions which the plaintiff has invoked, by proclaiming the freedom of the press.

Rr

SPRING 1811.
First District.

DENIS
vs.
LECLERC.

IF this argument could avail the defendant, this pretended proclamation of the freedom of the press would be as fatal to the people of these states, as the proclamation of the freedom of the negroes to the Hispaniola planters.

A brother may correspond with his brother, and grieve with him on the distresses of the family, occasioned by the misconduct of their father, and devise the means of alleviating the consequences of it. With secrecy he may succeed : but if a gazetteer, in whose hands accident or knavery may place his letter, cannot be compelled to respect the privacy of these family secrets, the writer will innocently incur the odium of the conduct of the younger son of Noah.

AN injured wife may commit to paper, for the information of a parent, the cause of family disquietude ; if the dishonest holder of a press, may give publicity to the complaint, adieu to all her hopes of domestic felicity.

IF a father remonstrate with a daughter on the errors of her conduct, the remedy which parental fondness and solicitude had prepared may, by the touch of a knavish printer, be turned into a deadly poison.

A merchant may communicate to his friend the danger of his situation, solicit a timely relief, which will certainly avert his ruin, the indiscretion or malice of the messenger, may plunge him in the abyss, from which secrecy might have saved him.

THE constitution of the United States does not contain any thing relating to the liberty of the press : but one of the amendments of it, art. 3, provides that " congress shall make no law.... " abridging the freedom of speech or of the " press."

IF this article can be invoked to support the defendant, in the right of printing the work of another, or violating the secrets of his correspondence, it will protect the propagation of any slander or libel. Neither congress, nor the circuit court of the United States, seem to have ever considered this article as susceptible of so strange a construction. Congress have passed an act to punish certain libels and we have seen the judges of the supreme court of the U. States carrying it into effect on the circuit. *United States* vs. *Lyon*, in Vermont, and *United States* vs. *Cooper*, in Pennsylvania. In every state, actions for defamation and prosecutions for libels, are daily carried on ; and this court has overruled the objection, in the case of *Territory* vs. *Nugent, ante* 112.

LASTLY, the subject of the plaintiff's suit has been represented as too trifling for the attention, and the discussion of it as incompatible with the gravity, of the court.

The defendant, however, seems to have attached an extraordinary degree of importance to his claim, and we have been employed several days

SPRING 1811.
First District.

DENIS
*vs.*
LECLERC.

SPRING 1811. in examining the extraordinary pretentions he
First District. sets up.    Surely, if one party so pertinaciously
insist on his right to attack the other, the latter
Denis
vs.
Leclerc. ought to be forgiven if he exert the same degree of industry, in endeavouring to avert the meditated mischief.

THE court of King's Bench in Great Britain did not think it repugnant to its gravity, nor a diminution of its dignity, to sit upon and determine a question arising on a most indecorous transaction : two young-men, tired of running their horses, at New-Market, terminating the frolic of the day, by making a race on their fathers' lives : on the very day of the death of one of them.    5 *Burrows*, 2802, *Earl of March* vs. *Pigot.*

PERHAPS, the judicial officers of this colony, under the government of Spain, might, when out of humour, turn off their fellow subjects, if approached with complaints on matters, which they deemed unimportant.    No American magistrate ever did so.    Whatever be the value, whatever the nature of the demand, or the motive that gives it rise, if it be authorised by law, the individual is entitled to the ear and the aid of the judge.

THE court feels no hesitation in avowing that, even if the authorities, adduced by the plaintiff's counsel, had not so powerfully supported his application, the circumstances of his case would have procured him the opportunity of having it

inquired into. Altho' the principal occupation of <span>SPRING 1811.<br>First District.</span>
the members of this court be to administer dis-
tributive justice, every one of them, it is hoped,    DENIS
will, at all times, remember that his, is a ministry    *vs.*<br>LECLERC.
of the peace—that he is *ex officio* a general con-
servator of it, throughout the territory—that
this court, being the tribunal of dernier resort and
being vested with common law jurisdiction, is
the *custos morum* of the country.  He would
have remembered that of all kinds of libelling,
the one attempted by the defendant, is the most
likely to excite the injured to seek redress by a
resort to arms—that a judicial declaration that
the municipal law was insufficient to the preven-
tion of the injury, would have extenuated, and
likely in the mind of the plaintiff justified, his
conclusion that nature resumed her rights, and
authorised the use of violence in averting the im-
pending evil, or obtaining satisfaction for it.
It is not unlikely, the judge would have consi-
dered the defendant's attempt as a flagitious out-
rage on good manners and decorum, the com-
pletion of which must have made decency weep.

IN balancing against all these considerations
the small inconvenience which the defendant
might sustain in being delayed a little while
in the wanton exercise of a right, at least du-
bious, no judge could have pondered much be-
fore he would determine, that the plaintiff had a
fair right to the oportunity of contesting such
strong pretentions, and to a process calculated

Spring 1811.
First District.

Denis
vs.
Leclerc.

if not to prevent, at least to delay, the distur. bance of the public tranquility, which is the first object of the law and the first care of the ma. gistrate, because it is the first blessing of so. ciety.

The court is now called upon to punish the defendant for a contempt of its authority and a disobedience of its injunction.

The facts which are presented as constituting his offence are : 1. The insertion of an adverti. sement in a news-paper, inviting all such persons as felt an inclination to see the letter, to gratify their curiosity and pointing out the means. 2. The annexing of a copy of the letter to the answer, and communicating the original to several persons applying for it, in pursuance of the advertisement.

ᵀ. It is contended, on the part of the plaintiff, that the advertisement is of itself a contempt of this court and would be considered as such, even if no copy had been annexed to the answer, nor the original communicated to any person.

It is impossible to read this advertisement without considering it as an evidence of the plaintiff's determination to effect obliquely that which the judge had inhibited him from doing, and deprive his antagonist of almost all the relief which the injunction was intended to afford him— as this determination could not be carried into

effect with impunity, the avowal of it seems to put the court at defiance.

II. The plaintiff's counsel further insists, that he has produced sufficient evidence of a publication, inasmuch as there was no necessity for a copy of the letter, with the answer, and that the production of the original to two persons, is a direct breach of the injunction.

THE counsel for the defendant says, he might lawfully annex a copy of the letter to the answer as part of that instrument.—That no matter which is stated in any memorial or petition for the redress of grievances, and addressed in the proper channel, however defamatory, is libellous—that the communication of the letter was in secret and confidence, and had the letter been a libel, the shewing of it in this manner would not have been held a libellous publication. *Esp. N. P.* 506. *Campbell N. P.* 267.

THE annexation of the copy to the answer and the production of the original to two gentlemen, are acts which, like all others, must receive their characters, from the motives in which they originated. If the copy was in the least necessary or usefull to the defendant in the suit, he had a right to annex it, but if it was irrelevant, if it could be of no service in the cause, there can be no excuse for thus giving publicity to a paper which the defendant had been enjoined from publishing.

Spring 1811.
First District.

Denis
vs.
Leclerc.

The court could not with propriety read the copy to ascertain this fact, but from no reference to the copy in the answer, nor from any argument offered, can it presume that the copy was annexed with any view of affording aid in the suit—the presumption, which naturally presents itself, is, that it was annexed for the sole purpose of publishing it : and this presumption has now ripened into evidence ; for it is confirmed by the use which the defendant has since made of the copy, by referring all persons desirous of seeing the letter to the records of this court.

It is true that the communication of information, disadvantageous to a third person and affecting his reputation, is not considered as illegal when made fairly and confidentially : it is however, otherwise when made for the sole purpose of working an injury.

This proposition, the defendant's counsel supports on the authority of *Campbell's N. P.* The case there reported *M'Dougall* vs. *Clarige* 267, certainly maintains it, but the decision cannot aid the defendant. The court determined that a letter written confidentially to persons who employed M'Dougall, as their solicitor, conveying charges, injurious to his professional character, in the management of certain concerns which they had intrusted to him, and in which the writer of the letter was likewise interested, could not be considered as a libel and made the sub-

ject of an action.   Lord Ellenborough observ-
ing that, if the defendant having acted *bona fide,*
with a view to the interests of himself and the   DENIS
persons whom he addressed, a communication of   *vs.*
LECLERC.
this sort, *which was not meant to go beyond those*
*immediately interested in it,* were the subject of
an action, it would be impossible for the affairs
of mankind to be conducted.

THIS decision is only the echo of that cited
out of *Espinasse, Rex* vs. *Bailie,* 506.  Lord
Mansfield there held that *a distribution of the*
*copies to the persons* ONLY, *who were from their*
*situation called on to redress the grievances and*
*had, from this situation, power to do it,* was not
a publication, that could be punished.

IN the present case, the publication was not
intended for the court, but for the public.   The
object the defendant had in view was, not to
procure any benefit to himself, but to do an in-
jury to the plaintiff. The court is therefore bound
to say it was tortious.

IN considering whether there be any exte-
nuating circumstance in the defendant's case,
the court finds hardly any thing but matters of
aggravation.   His conduct in court has been far
from authorising a contrary conclusion. The court
is, therefore, bound to say, that the defendant
must pay a fine of fifty dollars and be impri-
soned during ten days.