**JOHNSON et v SCRIPPS PUBLISHING CO. et**

Common Pleas Court, Cuyahoga Co.

No. 500818. Decided Sept. 24, 1940.

Land & Land, and Jerome Land, of Cleveland, of counsel for plaintiffs.

Baker, Hostetler & Patterson, and Marcellus DeVaughn, Cleveland, for defendants.

**OPINION**

By HURD, J.

This case comes before this court upon application of the plaintiffs for a temporary order to restrain the de-

fendants from continuing the publication of articles which include lists of names appearing upon nominating petitions of candidates of the Communist Party. The action is founded upon the claim that publication of these articles by the defendant, The Cleveland Press, constitutes an invasion of the right of privacy of the plaintiffs resulting in irreparable damage.

Upon hearing, the defendants have demurred to the petition on the ground that it is apparent upon its face that it does not contain facts sufficient to constitute a cause of action in law or equity.

Because we are called upon to rule upon the demurrer we deem it advisable to set forth the pertinent parts of the petition:

"Plaintiff Arnold Johnson says that he is a candidate for the office of governor of Ohio in the present election campaign; that in accordance with the election laws of the state of Ohio nominating petitions in which he is presented as such candidate have been circulated among the voters of Ohio and said petitions duly filed with the secretary of state on the 26th day of August, 1940, in accordance with law.

"Plaintiff Joseph Brandt says that he is the county organizer of the Communist Party, Cuyahoga County, Ohio, and one of the signers of said petition hereinabove referred to. Plaintiffs state that they bring this action on behalf of themselves, the candidates on said petition, the Communist Party of Cuyahoga County, and the signers of said petition. Plaintiffs further state that defendant The Scripps Publishing Company is an Ohio corporation doing business in said state as a publishing and distributing company of the daily newspaper 'The Cleveland Press'; that the defendant Louis B. Selzer is the editor of said newspaper, that the defendant John G. Mielink is the general manager of said newspaper; that the defendant Worth C. Coutney is the business manager of said publication.

"For their cause of action against the defendants plaintiffs state that on the 27th day of August, 1940, in the 'Final'

edition of said newspaper, the said defendants published or caused to be published an article entitled 'Press Publishes Names Listed by Communists'; that in said article numerous names and addresses of signers of said Communist Party petitions are published; that there also appears in heavy type in said article the following invitation: 'If your name is published as a signer to the Communist election petition and you did not sign, you are asked to notify the Press at Cherry 0808 and your denial will be printed. In this way you will also assist the Board of Elections in its check for fraud in the petitions.'

"Plaintiffs state that said publication and the circulation thereof constitutes a malicious and vicious invasion of the right of privacy of the said petition signers; that said process of petitioning is the only lawful method provided for a minority party to nominate its candidates and thereby constitutes a form of primary election, and said article violates the right to a secret vote in said primary; that the said defendants have utilized the present red-baiting hysteria to provoke an open terror through said article against said signers; that said defendants have subjected said signers to open economic deprivation by exposing them to discharge from their employment; that said publication constitutes a virtual blacklist of all said signers in the manner of a facist bulletin; that said publication in its obvious playing upon the so-called 'Fifth Column' and Communist hysteria whipped up by numerous agencies among which said publication is in the foreground, has exposed said signers to open terror and physical violence; that by its euphemistic invitation as set forth in its petition attempting to deprive the Communist Party, a legal party, from its right to appear on the ballot in the forthcoming election by intimidating signers into coming forth now and denying their signatures in order to escape the public exposure; that it thereby deprives the Communist Party of its right as a lawful party and legal party to nominate its candidates and deprives its candidates from the

right to run; that said publication thereby interferes with the rights guaranteed such plaintiffs and those they represent by the United States and Ohio Constitutions and the laws of Ohio."

After some further allegations of like character to those quoted, the plaintiffs state:

"That unless the defendants are restrained they will continue to publish such articles or similar articles and lists; that they have been irreparably damaged by said publication and will continue to be so damaged, unless said defendants are immediately enjoined from further publication of said or like nature."

The petition concludes with a prayer for a temporary restraining order, and upon final hearing that the temporary restraining order be made permanent, and for judgment against the defendants in the sum of $100,000 with interest and costs.

Before proceeding to a discussion of the questions of law raised by the demurrer, we wish to emphasize that this court is not now concerned with the principles of the Communist Party, and that there is no issue in this proceeding in respect thereto.

The issues which we are called upon to determine involve broad general principles of law, applying with equal force to any like situation without respect to persons or parties. It is the opinion of this court that the principles of law herein enunciated would apply with equal force to signers of nominating petitions of either major political party or to non-partisan petitions such as are provided by law for the nomination of judges.

As we analyze the petition the grievances complained of may be divided into three classifications:

1. A claimed invasion of the "right of privacy" generally;

2. A claimed invasion of the "right of privacy" in respect of the secrecy of the ballot;

3. A claimed intimidation of petition signers by defendants.

It will be noticed also that the petition asks for two-fold relief, one in equity for injunction against the future publication of the articles, the other at law for damages by reason of the articles already published.

Inasmuch as the plaintiffs seek immediate and summary relief by way of their motion for a temporary restraining order pending final hearing, and for a permanent order upon such final hearing, we shall consider first whether or not the petition states a cause of action in equity entitling the plaintiffs to temporary and permanent relief by way of injunctive process.

The first major question therefore is whether this court may intervene by injunction to impose a censorship in advance upon what shall appear in print, concerning the right of privacy of the plaintiffs. If so, under what conditions may the court so act, and are such conditions presented by the case at bar? What general and specific rules apply?

Counsel for the defense in support of their demurrer rely upon the provisions of the Constitution of the United States and the Bill of Rights of Ohio which contain prohibitions against the enactment of laws abridging the freedom of speech or of the press. They have cited many authorities in support of this proposition which we have examined with care, as well as many other authorities on this same subject.

Counsel for plaintiffs cite no authority, but argue that a court of equity may intervene as a matter of right and enjoin threatened publication of matter alleged to be an invasion of the right of privacy of the plaintiffs and the right to secrecy in placing their names upon the nominating petitions in question.

The fundamental law binding upon all parties is contained in the First Amendment to the Constitution of the United States which provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or the right of the people

peaceably to assemble, and to petition the government for a redress of grievances."

and Sec. 11 of Art. I of the Constitution of the State of Ohio which provides:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

Let us first consider the Ohio authorities on this subject. The following paragraph, taken from 8 O. Jur., §341, and entitled "Liberty of the Press" is directly in point:

"Freedom of the press is one of the strongest bulwarks of liberty. The primary meaning of 'liberty of the press' as understood at the time our early constitutions were framed, was freedom from any censorship of the press, and from all such restraint upon publications as had been practiced by monarchial or despotic government in order to stifle the efforts of patriots toward enlightening their fellow subjects upon the rights, and as to the duties of their rulers. The freedom of the press, properly understood, is not inconsistent with the protection due to private character. It has been well defined as consisting in the right to publish with impunity, the truth, for good motives, and for justifiable ends, whether it respects government, magistry, or individuals. It imports freedom from any censorship ▋ over what shall be published, exemption from control in advance over the dissemination of ideas by writing or printing. It does not import that one may not be mulcted in damages or punished for what he has published, if after the act it is shown to be contrary to law, but that he should not be restrained beforehand. It is clear that the weight of authority in both England and the United States is substantially all one way, against the power of a court of

equity to enjoin merely an anticipated libel. The constitutional provision in favor of freedom of speech and of the press, subject to responsibility for abuse, permits no restraint beforehand by either statutory enactment or judicial injunction."

In support of the text there is a decision by this court in the year 1885, reported in 9 Oh. Dec. Rep. 428, 13 Weekly Law Bulletin 335, wherein Judge Jones of this court rendered a most scholarly and interesting opinion. We consider the law of this case to be pertinent, although it deals with an injunction to restrain anticipated libel, whereas this case does not involve libel but has to do with restraint of anticipated publication of matter considered to be injurious to the constitutional rights of privacy.

We quote two paragraphs of the syllabus of that case:

"1. It is not within the jurisdiction of a court of equity to restrain by injunction the publication of an anticipated libel or slander, even though business reputation is involved and the intended publisher is insolvent.

"2. An injunction beforehand would be an abridgement of the freedom of speech and of the press granted by Art. I, Sec. 11, of the Bill of Rights in the Constitution of Ohio."

In a discussion of the case the court said:

"It is certainly extraordinary, if there exists a power in courts of equity to interfere by injunction to restrain the publication of anticipated libel, that no instance of the kind can be found in any reported case in Ohio."

The learned judge discusses many American and English cases on the subject of injunction and concludes that:

"On whatever ground the refusal may be put or however plausible the arguments may be in favor of exercising such jurisdiction, it is clear that the

weight of authorities in both England and the United States are substantially all one way, against the power of a court of equity to enjoin an anticipated libel merely, and I hold that the constitutional provision in favor of freedom of speech and of the press, subject to responsibility for abuse, permits no restraint beforehand by either statutory enactment or judicial injunction."

"And the main reasons on which this equity jurisdiction is denied or refused to be exercised are as follows:

"1. Because there is an adequate remedy as law in a suit for damages for the alleged slander or libel.

"2. Because of the utter impracticability of supervising anticipated publications by the courts through injunctions and proceedings for contempt; enjoin a publication here, and it could be printed and sent here from forty other states or territories.

"3. The constitutional objection which is quite as strong in Ohio as in either of the other states quoted * * *. On the whole I hold in this case that the plaintiff has no cause of action, and I therefore sustain the demurrer, dissolve the injunction heretofore granted, and dismiss the plaintiff's bill."

Upon analysis of subsequent Ohio decisions we find this case has never been reversed or modified. On the contrary, it has been cited with approval as being the law of Ohio.

Turning to a discussion of authorities outside of the state of Ohio, we deem it helpful to cite Section 242 of Volume 6, Ruling Case Law, entitled "Restraint by Injunction" as follows:

"**An essential element of the liberty of the press is its freedom from all censorship over what shall be published and exemption from control in advance as to what shall appear in print. Consequently it has been asserted that the right of freedom of speech and the press can not coincide with the idea of preventing such freedom of speech or of the press by injunction.**" Citing: Daily v Superior

Court, 112 Cal. 94, 44 Pac., 459, 33 A. S. R. 160, 32 L. R. A. 273; Schwartz v Edrington, 133 L. A., 235, 62 So. 660, 47 L. R. A. (N.S.) 291; Marx & Hassjeans' Clothing Co. v Watson, 168 Mo. 133, 67 S. W. 391, 90 A. S. R. 440, 56 L. R. A. 951.

Sec. 467, Vol. 12, Corpus Juris, entitled: **"Freedom of Speech and of the Press in General,"** states in part:

"Freedom of speech and freedom of the press are the corner stones of Anglo-Saxon Democratic institutions. This freedom is guaranteed against invasion by the federal government by the first amendment to the Constitution of the United States * * * and it is protected against infringement by the state governments by similar guaranties in the constitutions of the respective states."

Sec. 472 of the same volume entitled **"Injunctions to Prevent Abuse of Right"** asserts:

"Abuse of the rights of free speech or free publication may not be enjoined by the courts merely on the ground that the speech or publication sought to be enjoined would constitute slander or libel, nor as a general rule may such a false statement or publication be enjoined on the ground that it will tend to injure plaintiff in his business or property right." Authorities cited in support of the text are: State v Pierce, 163 Wisc., 615, 158 N. W. 696; U. S. Constitution, Amendment 1; Mutual Film Co. v Ohio Industrial Commission, 215 Fed. 138; (Affirmed 236 U. S. 230, 35 S. C. T. 387, 59 L. Ed. 552. Ann. Cas 1916, C. 296). Goldman v Reyborn, 36 Pa. Co., 581; State v Haffer (Wash.) 168 P. 45; N. Y. Juvenile Guardian Soc v Roosevelt, 7 Daly (N. Y.) 188; Brendreth v Lentz, 8 Page (N. Y.) 23; 24 Am. D. 368; **Dopp v Doll, 9 Ohio Dec. Rep. 428.**

To the same effect is paragraph 213 Page 628, Vol. 16 Corpus Juris Secundum which states:

"Freedom of the press and freedom of speech are the same, being distin-

guished only in the form of utterance. The liberty of the press is not confined to newspapers and periodicals, but necessarily embraces pamphlets, leaflets and every sort of publication affording a vehicle of opinion and information. Statutes and ordinances in violation of the constitutional guaranties are null and void. * * * Moreover the courts have been held to be included within a prohibition that no law shall be passed restraining freedom of speech or of the press. Freedom of speech and of the press implies the right freely to utter and publish whatever a citizen may please with immunity from legal censure and punishment for the publication, so long as it is not harmful in its character when tested by such standards as the law affords. **The chief purpose of the constitutional guaranties is to prevent previous restraint or censorship on speech or press** such as had been practiced formerly by governments although they are also a positive injunction against the curtailment of the right of expression after it is made, and hence include liberty of circulation."

Cited in support of the text are the following cases:

Francis v People of Virgin Islands, C. C. A., Virgin Islands, 11 F. 2d, 860; **Certiorari** denied; Francis v Williams, 47 S. Ct. 91, 273 U. S. 693, Ex Parte Lyons, Cal. Ap. 81, P. 2nd, 190; Lovell v City of Griffin, Ga., 58 S. Ct. 666, 303 U. S. 444-82. L. Ed. 949, Reversing Lovell v City of Griffin, 191 S. E. 152; 55 Ga. Ap. 609; Barton v City of Bessemer, 173 So. 621, 27 A. L. A. Ap. 413; Spayd v Ringing Rock Lodge No. 665; Brotherhood of Railroad Trainmen of Pottstown, 113 A. 70, 270 Pa., 67, 14 A. L. R., 1443, and other authorities to which reference is made in said volume.

The recent text by Robert W. Jones of the University of Washington, entitled "Law of Journalism" (published 1940) cited by counsel for defense, contains the following statements, page 1:

"Freedom of the press is the right to publish without official preview or censorship and without official obstruc-tions, anything the editor and proprietor of a newspaper, periodical or magazine may decide to publish, subject, however, to the penalties imposed by law for the publication of libel, contempt of court, sedition, obscenity, blasphemy, or other non-mailable matter."

and page 2:

"The very essence of press freedom is in the words of Mr. Justice Cooley, 'a right to freely utter and write whatever the citizen may please, and to be protected against responsibility for so doing, except as far as such publications from their blasphemy, obscenity or scandalous character may be a public offense or as by their falsehood or malice may naturally affect the standing, reputation or peculiar interests of individuals'." Citing Cooley's Constitutional Limitations, page 604.

And again page 3:

"Licensing the press, that is demanding that a newspaper or periodical meet requirements laid down by an official board of bureau, would invade the freedom of the press and set up censorship. As Blackstone said: 'To subject the press to the restrictive power of a licensor, as was formerly done, both before and since the Revolution, is to subject all freedom of sentiment to the prejudices of one man and make him the arbitrary and inviolable judge of all controverted points of learning, religion and government." Citing. Blackstone's Commentaries, Vol. 4, page 152.

One of the most recent authoritative pronouncements on this subject is contained in the opinion of Mr. Justice Hughes in the case of Near v Minnesota, Reported in 283 U. S. 697, 51 S. C. T., 625, in the course of which he said:

"The fact that for approximately 150 years there has been almost entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is

significant of the deepseated conviction that such restraints would violate public right. Public officers whose character and conduct remain open to debate and free discussion in the press, find their remedies for false accusations in actions under libel laws providing for redress and punishment in any proceedings to restrain the publications in newspapers and periodicals. **The general principle that the constitutional guaranty of the liberty of the press gives immunity from previous restraint has been approved in many decisions under the provisions of state constitutions.** The importance of this immunity has not lessened. \* \* \* Subsequent punishment for such abuses as may exist is the proper remedy consistent with constitutional privilege. If, however, the publisher has a constitutional right to publish without previous restraint an edition of his newspaper charging official derelictions, it can not be denied that he may publish subsequent editions for the same purposes. He does not lose his right by exercising it. If his right exists it may be exercised in publishing nine editions, as in this case, as well as in one edition. If previous restraint is permissible it may be imposed at once; indeed the wrong may be as serious in one publication as in several."

Paragraph 7 of the syllabus:

"The chief purpose of the guaranty is to prevent previous restraints upon publication. The libeler, however, remains criminally and civilly responsible for his libels."

While some of the authorities cited and quoted deal with the law of injunctions as applied to libel there is, we believe, a close analogy in principle to the law of injunction as applied to the right of privacy.

It is clear from the authorities cited and quoted, as well as many others, omitted for the sake of brevity, that it is the general rule of law that a court of equity is without jurisdiction to impose censorship or control in ad-

vance of publication upon matter to appear in print.

It must be noted, however, that this general rule has some exceptions, having application in a very limited class of cases. We propose to consider some of the exceptions in order to determine whether or not the plaintiffs set forth in their petition a state of facts indicating a clear exigency which would entitle them to such exceptional injunctive relief.

For instance: "It has been held that after an action at law in which there is a verdict finding the statements published to be false, plaintiff on a proper showing may have an injunction restraining any further publication of the matter which the jury has found to be acts of libel or slander, and of slanders or libels of a like or similar purport." 32 Corpus Juris, citing Wolf v Harris, 267 Mo. 405, 184, S. W., 1139; Flint v Hutchinson Smoke Burner Co., 110 Mo. 492, 19 S. W. 804.

It has also been held:

"Where the words or writing complained of are not only libelous but are of such a nature as to threaten, intimidate or coerce others into discontinuing business relations with the complaining party, injunctive relief may be granted, \* \* \* and such restraint does not abridge freedom of speech and of the press, although there are decisions which maintain the contrary view." 16 Corpus Juris Secundum, page 639.

It also has been held that courts may enjoin under certain circumstances the reproduction of one's photograph without consent. The laws also generally protect by injunctive process in cases of copyrighted compositions, private letters, lottery advertisements, obscene and seditious publications, and, in certain cases where the publication is in furtherance of an unlawful boycott.

The case of Schwartz et v Edrington, decided by the Supreme Court of Louisiana, 133 La 235, 62 So. 660, presents facts and circumstances under which a court of equity will grant injunctive relief for a threatened invasion of the

right of privacy. This case, has been cited as supporting authority by most of the texts examined, including American Jurisprudence, Vol. 28, page 210 and American Annotated Cases, Vol. 36, 1915-B.

In this case the court enjoined the publication of the names of the signers of a petition to incorporate a village. The syllabus is as follows:

"The privilege of free publication guaranteed by the constitutions of the United States and of this state has its limitations. It does not for instance include the right to publish private letters or copyrighted compositions of another, obscene matter, lottery advertisements, or notices used as instrumentalities for making effective a boycott which has been enjoined under the Sherman Act. (Act July 2nd, 1890.) C. 647, 26 Stat. 209. U. S. Comp. St. 1901, p. 3200) or some other matters that might be mentioned. Under the state constitution any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty, but that grant does not include the right to publish what purports to be a signed petition, as expressing the sentiments, not of the publisher, but of the signers, after the signers have disowned and repudiated it, as having been signed under a misapprehension; and the continued publication of the names of such signers, in that connection, may be enjoined, and the parties violating the injunction may be punished for contempt of the court by which it was issued."

There are a number of distinguishing features between this case and the instant case. In this case a trial court had determined that the names of the signers were secured under a misapprehension as to the facts and that the signatures had been disowned and repudiated by the signers. These facts were known to the publisher when he published the names of the signers in direct disobedience of the court's injunction. In the case at bar the plaintiffs admit the validity of the signatures. They likewise admit that the signatures were attached to nominating petitions which were filed with the secretary of state, open and subject to public inspection, under the general election laws of the State of Ohio as will hereinafter be noted at further length.

A review of all of the cases and authorities on the subject leads inevitably to the conclusion that the great weight of authority of the American cases under the doctrine of freedom of speech and of the press, in the absence of some peculiar and exceptional facts and circumstances, none of which █ are present in the instant case, is clearly against the jurisdiction of this court to grant injunctive relief restraining the defendants from publication in the instant case. Therefore we conclude that the petition does not state a cause of action in equity and that if the publication of the subject matter is actionable at all it must be by an action at law for damages.

This brings us to a consideration of the second major question raised by the demurrer as to whether or not the petition states a cause of action at law entitling the plaintiffs to damages in respect to the matter heretofore published. As we have already indicated this right is presented by the demurrer because of plaintiffs' allegation that the articles heretofore published being an invasion of the right of privacy have caused them to suffer serious injury for which they seek damages.

Plaintiffs predicate their claim for relief upon the contention that the procedure of nominating by petition is the only method by which a minority party may obtain for its candidates a place on the ballot. They allege that such procedure constitutes a form of primary election for the minority party candidates and hence becomes clothed with the privilege of secrecy in their favor. No authorities are cited by counsel in support of their contention, but in view of the serious nature of the claim herein presented, we deem it advisable to examine thoroughly into the merits of this issue.

The origin of the doctrine of the right of privacy is quite generally ascribed to an article of Louis D. Brandeis and Samuel D. Warren, published in 4 Harvard Law Review, page 193 (1890) entitled "The Right of Privacy".

The right of privacy is variously defined as:

"A right of the individual to be let alone or to live a life of seclusion or to be free from unwarranted publicity, or to live without unwarranted interference by the public about matters with which the public is not necessarily concerned." 54 Corpus Juris 816, and

"The right of privacy is a right to be let alone to go one's way without being in the public eye, to be free from intrusion into one's private business and from unauthorized publicity concerning one's personal and private affairs. The right, where it has been recognized by the courts at all is based either upon a statute or upon judicial interpretation and inference from existing legal doctrines." Jones Law of Journalism, page 205.

"The right of privacy is the right to be let alone; the right of a person to be free from unwarranted publicity. A more specific but less accurate definition is the right to live without having one's name, picture or statue, * * * made public against his will. The law respecting this right is purely modern. No mention of it is to be found in Blackstone, Kent or any of the great commentators of the law." 21 R. C. L. 1196.

It appears that no case on the "right of privacy" has ever been passed upon by the Supreme Court of the United States. It appears also that there is much conflict of authority on the subject as is evidenced in cases passed upon by courts of inferior jurisdiction of the United States and by the courts of Georgia, Kansas, Kentucky, Louisiana, Missouri, New Jersey, California, New York and other jurisdictions.

"It has been said that while the cases in which a right of privacy has been asserted are for the most part cases involving the use of the name or picture of an individual, the right has also been recognized with reference to a publication of his private affairs. However, the right to privacy does not prohibit communication of any matter though in its nature private when the publication is made under circumstances which would render it a privileged communication according to the rule of slander and libel. * * * In any event the right of privacy must be recognized and enforced without curtailment of constitutional guaranties of freedom of speech and of the press. * * * The right of privacy does not extend so far as to support those rights which spring from social conditions, including business relations, or to . prohibit the publication of matter which is of public or general interest * * * and a right which is a matter of public interest * * * can not claim any right of privacy." 54 C. J., 818-819.

All authorities which recognize "right of privacy" as a legal right for the violation of which there is a legal remedy agree upon certain fundamentals namely:

(a) The right to privacy does not prohibit publication of matter which is of public or general interest,

(b) It does not prohibit publication of any matter, though in its nature private, when the publication is made under circumstances which would render it a privileged communication, according to the law of slander and libel.

(c) The right ceases upon the publication of the fact by the individual or with his consent. See Article 4 Harvard Law Review, 193, supra and other authorities cited.

Let us now consider the status of the signers of the nominating petitions in respect of their claim for damages in the instant case. Upon demurrer the allegations of the petition must be taken as true and the plaintiffs allege that the nominating petitions are filed with the secretary of state in pursuance of

the election laws of Ohio. Because the right of such procedure arises from the provisions of §4785-92 GC, we quote the pertinent parts of that section as follows:

"**Filing Nominating Petition.** All separate petition papers comprising the nominating petition of a candidate shall be assembled and filed with the election authorities as one instrument; and shall be accompanied by the acceptance of such person whose name has been submitted as a candidate. * * * When filed with the secretary of state, in the case of state petitions, or with the Board of Elections in the most populous county in the case of district petitions, such authorities shall transmit immediately to the boards of elections in the several counties affected, the portion of such petition containing signatures from such counties. **Such petition papers shall be preserved and open under proper regulations to public inspection for at least five (5) days prior to the fifty-fifth day preceding the election, during which time objections may be filed thereto and be heard by the secretary of state or board as the case may be.** When any such objection is so made, or any question so arises, notice thereof shall forthwith be mailed to the candidates affected thereby. Such objections or other questions shall be heard by the secretary of state or the board, as the case may be, and the findings and the decision made thereon shall be final. * * *"

It is immediately clear from an examination of this section that the privilege of nominating by petition is limited by certain conditions, one of the most important of which is that "such petition shall be preserved and **open** under proper regulations to public **inspection** for at least five days prior to the fifty-fifth day preceding the election during which time objections **may be filed thereto** and be heard by the secretary of state or board as the case may be."

There are indeed excellent reasons for such precautions, for it is apparent that the intention of the legislature in providing this safeguard was to protect against fraud, to prohibit the recording of invalid or forged signatures, and to preclude the nomination of any candidate who failed to file the required number of valid signatures.

To suggest that the legislature intended to surround the procedure of nomination by petition with secrecy in the light of these provisions is to do violence to elementary reasoning.

It is the opinion of the court that the moment the plaintiffs filed their nominating petitions with the secretary of state, said petitions became **ipso facto** documents of public record **open to public inspection and publication.** The very act of filing divested these petitions of any private character with which they may theretofore have been vested, consequently there can be no immunity in favor of the signers of the petition creating liability against the defendants for publication.

This brings us to a consideration of the further contention of the plaintiffs that the procedure of nominating by petition is the only method by which a minority party may obtain a place on the ballot and hence constitutes a form of primary election. A nominating petition is exactly what the term implies. In no sense can it be said to be any form of election. It does not deprive anyone of his right to a secret ballot. Quite the contrary. It provides an opportunity for voters, who might not otherwise have had such an opportunity in their free choice of a candidate, to cast a secret ballot for one so nominated.

The court feels that nominating by petition is a privilege of citizenship surrounded by all the duties and obligations of citizenship. An elector who avails himself of the right to nominate by petition does so with a full knowledge of the responsibilities that attach. He does so in full contemplation that the petition which he signs, when filed with the secretary of state, will become a public record open to public inspection.

There are few privileges that do not carry with them some burdens. He who avails himself of the privilege should accept the burden. If in the exercise of his privilege an elector espouses a candidate or cause which is not popular, he does so in full contemplation and acceptance of the consequences that flow naturally from his voluntary act. The petitioner in effect consented by the very act of signing that his name could be made pubic. If in the heat of violent differences of opinion some odium attaches to his act in the eyes of his fellow citizens, that is the burden and responsibility which the elector accepts when he chooses his course of conduct. In view of this consideration we feel that the contention of the plaintiffs on this proposition must likewise fail.

The claim of the right of privacy or secrecy must also fail on the ground that the procedure provided by law for the placing of names and parties on the ballot springs from social and political conditions and is a matter of great general or public interest. To curtail the right of publication or to make the publisher liable to respond in damages would be a subversion of the constitutional guaranties of the freedom of speech and of the press, particularly when the petitions have been placed on file in the office of the secretary of state in pursuance of the election laws. The acts of the signers must be regarded as in the nature of public acts distinguished from matters of a strictly private and personal nature in which the public would have no interest. In other words the rights of the public are paramount to the right of privacy of the individual, when the individual engages in conduct which vitally affects the public welfare and public concern.

The plaintiffs complain of intimidation by the defendant the Cleveland Press because in connection with the publication of the articles defendant inserted a notice in a "box" to the effect that persons whose names were published as signers and who did not in fact sign said petition, could notify the Cleveland Press thereof and that a correction would be printed. The plaintiffs asserted that the publication of this offer of retraction by the publisher was an attempt to intimidate the signers of the nominating petitions. The court can not concur in this assumption.

It must be observed first that the defendant was within its legal rights in printing the names appearing upon the nominating petitions after they were filed with the secretary of state. If would also be the duty of the defendant, upon notice that the signers disowned and repudiated their signatures, to print such repudiation and denial in favor of such persons whether upon the ground of forgery or that the signatures were given under a misapprehension of facts or obtained by misrepresentation or otherwise. This would be in line with the holding in the case of Schwartz et v Edrington, supra.

In this connection it should be pointed out that under the provisions of the General Code, persons who attach their signatures to such nominating petitions in good faith, may not withdraw their signatures. The only ground on which signatures may be withdrawn is the ground of fraud, mistake, duress, forgery, etc. It would appear to us therefore that the defendant was fully justified in inserting such a notice in connection with the articles containing the lists of the names of the signers, both on the ground of legal duty and upon the ground of fairness and justice to the persons involved and to the reading public at large.

It would appear to us that plaintiffs stand before this court only upon the basis of the claimed violation of their constitutional rights, the right to enjoy the fruits of citizenship in a democracy. It is a right that permits the very existence of minority parties, gives them the right to espouse any cause or candidacy, popular or unpopular, within the framework of our laws and constitutional guaranties. Side by side

434

with the constitutional right of a minority party to promulgate its principles and to promote its cause is the right of freedom of the speech and of the press. Freedom of speech and of the press is in itself a right and constitutional guaranty that the plaintiffs should zealously guard and protect in defense of their own rights, as members of a minority party. We are most favorably impressed with the comment of the court in the case of Diener v Star-Chronicle Publishing Co., 230 Mo. 613, 132 S. W. 1143, 33 L. R. A., (N.S.) 216, wherein the court said: "The right of freedom of speech, of fair comment with honest purpose in matters of public concern is on the foot of broad **bono publico** and founded upon public policy. Free discussion is the foundation on which every free government itself is builded. That lost, all is lost. The two exist or perish together. They mean the same thing. It is only in despotisms that one must speak **sub rosa**, or in whispers, with bated breath, around the corner, or in the dark, on a subject touching the common welfare. It is the brightest jewel in the crown of the law to seek and maintain the golden mean between defamation on one hand and a healthy and robust right of free public discussion on the other."

In view of our examination of all of the authorities we conclude that the petition of the plaintiffs does not state facts sufficient to constitute a cause of action at law. Consequently upon a consideration of the petition, the arguments of counsel and the authorities, we can reach only one conclusion and that is that the plaintiffs have failed to state in their petition a right of action sounding either in law or equity. Therefore the demurrer to the petition must be sustained. It appearing that the plaintiffs having been granted leave to plead further, and having failed to do so, the action is dismissed at plaintiffs' costs. Exceptions allowed to all proper parties.