**SCHMUKLER, Plaintiff, v. OHIO-BELL TELEPHONE CO., Defendant.**

Common Pleas Court, Cuyahoga County.

No. 619821.   Decided July 25, 1953.

214

Marvin Nebin, Wm. B. Webber, Cleveland, for plaintiff.
Jones, Day, Cockley & Reavis, Victor DeMarco, Cleveland, for defendant.

## OPINION

By NICOLA, J:

The Court, at the close of plaintiff's evidence on defendant's ·motion, directed the jury to return a verdict for said defendant. In due time the plaintiff filed her motion for new trial wherein she complains that the Court committed error in directing said verdict and sets up five grounds of error in said motion. The basic ground, however, is that the plaintiff's privacy was invaded by the defendant in monitoring the telephone installed in her home.

In order properly to determine whether there is merit in plaintiff's contention we must first consider the facts upon which her claim is founded as shown by the evidence:

I. In order to prove her case the plaintiff not only testified her self but called as her witnesses the various officials and employees of the defendant who were involved in the installation of her telephone and in what happened thereafter.

It was clearly established that in June 1950, the plaintiff had in her home a two-party line telephone service which was for residence use only,—that is for social calls. The plaintiff asked a representative of the company for additional service since she was and had been in business and needed more telephone service. At this time she admitted that she had previously used the two-party line for that purpose. The defendant's representative told her that the two-party line could not be used for business and that she would have to have a business line with metered service. She got angry and told the representative to take out the telephone she had. Later that same day she reconsidered and again called and ordered a business telephone with metered service and received the same number that she had previously used. She then requested that there be installed in her home a new line

for home and social purposes. She was specifically told that she could not use the home telephone for business calls. To this she agreed, so that in the month of September two telephones were installed in her home, one to be used for business and the other for social purposes. It is important to keep in mind that the business telephone was metered service, whereas the two-party line home telephone was for social purposes and was unmetered.

The supervisor of this particular branch of the defendant's service from his conversation with the plaintiff and from her actions suspicioned that the plaintiff would use the home telephone for business purposes so he ordered that the **Home** telephone be monitored. This was done first by a "pen" register which reported on a tape the number of the calling telephone and the number of the telephone called. This of course did not determine the character of the use being made by the plaintiff of the home telephone, but it did show an abnormal number of calls therefrom. As this Court remembers there were as high as 37 calls on the unmetered telephone one evening between the hours of 5:00 and 8:00 P. M., but generally there were from 20 to 30 calls an evening.

The number being so abnormal the company's service representative determined to manually monitor said calls. This is done by listening in on the telephone in order to determine the nature of the call. In the instant case Mrs. Thompson, an old employee of the defendant and a witness for the plaintiff who did the monitoring described in detail the pen register and how it worked as well as the manual monitoring of plaintiff's telephone. She testified that great care was exercised to maintain secrecy. The manual testing of the telephone was conducted in a closed room occupied by her for some days from 9:00 A. M. to 4:30 P. M.; when the line showed a call she listened in just long enough to determine whether the call was for business or social in nature. She did not attempt to get the full conversation and in no way pried into plaintiff's business. She found there were business calls on the social telephone even in the day time when plaintiff usually was working away from home. She testified that she was in the business of selling storm windows and made her telephone calls to prospective customers in the evening and made measurements on the job in the day time.

On October 31st, 1950, a service representative of the defendant talked to the plaintiff and advised her that the defendant was aware of plaintiff's use of the residence telephone for business purposes contrary to the regulations and contrary to her express agreement. The plaintiff asked how this

was determined, and she was told of the pen register which showed an excessive number of calls on the residence telephone. Her reply was, "Well, I can't see where that proves anything,—what does that prove?" When she was told that the defendant knew each number called by her, she replied, "I still can't see where that proves anything." Thereupon she was told that her telephone had been manually monitored and that she had made calls on the residence telephone for business purposes. She testified that this information gave her a blinding headache and that she could not sleep that night. However, next morning she told her business associates and by 9:30 A. M., she was at the office of one of the metropolitan newspapers and told them all about the invasion of her privacy. This obtained her considerable publicity. She further testified that even to the time of trial whenever she thinks about the invasion of her rights she gets a splitting headache.

Lest there be any mistake as to her attitude in the matter, it was developed in the course of the trial that she specifically agreed that if the telephone company would put the residence telephone in her home in addition to the business telephone, that she would use the business telephone for business purposes and the residence telephone for social purposes. Then the following was elicited from her:

"Q. The fact of the matter is that although you agreed to do that you promptly disregarded your agreement?

"A. I don't deny that.

"Q. You don't deny that you did it?

"A. No.

"Q. You made business calls on the residence 'phone that was in the bed-room from time to time?

"A. Yes.

"Q. Did you make these business calls on the residence 'phone from time to time because it was more convenient for you to make those calls? Is that the only reason you did that?

"A. I wouldn't say that was the only reason.

"Q. What was the other reason that you made business calls on your residence 'phone in your bed room?

"A. It might have been because I was thinking that I didn't want to have any overcalls on the business 'phone.

"Q. You continued to use the residence 'phone for business purposes after the incident did you not?

"A. Yes."

The plaintiff also testified that of some 26 calls one evening made over the residence telephone 13 or 14 of said calls were for business purposes.

There was admitted in evidence during plaintiff's case in chief the regulations of the company and the tariff sheets filed by the defendant with the Public Utilities Commission of Ohio as Exhibit 3. Under said tariffs approved by the Commission the charge for the business telephone is $6.00 for 85 or less local message units; 4-½ cents each for the next 65 local message units, and 4 cents for each unit above 150. The residence two-party line of unlimited service cost her $4.05 per month under Schedule B, Section 1, sub-section (b) of said tariffs.

II. This leads us to the question at issue, was plaintiff's right of privacy invaded, as she claims, and if so, under the facts is her case one that should have been submitted to the jury for its consideration.

We must first inquire as to what we mean by the right of privacy or the right to privacy, since it is not even mentioned by any of the old commentators of the law.

It is usually defined as "the right of the individual to be let alone or to lead a life of seclusion, or to be free from unwarranted publicity, or to live without unwarranted interference by the public about matters with which the public is not necessarily concerned." It was given prominence by an article written by Brandeis and Warren in the 4th Harvard Law Review of December 15, 1890. The article is an instance of fine legal writing, exhaustive and interesting. Brandeis later became a Justice of the Supreme Court of the United States and was a man of wide vision, sound principles and of great learning. Its conclusion is "that the protection afforded to thoughts, sentiments, and emotions expressed through the medium of writing or of the arts so far as it consists in preventing publication is merely an instance of the enforcement of the more general right of the individual to be let alone. * * * and the principle which protects personal writings and all other personal productions not against theft and physical appropriation but against publication in any form is in reality not the principle of private property but that of an individual personality."

It will be noted that the right of privacy, as such, has not been constitutionally protected except possibly the right of one to enjoy his home against unreasonable invasion, which naturally includes invasion of his private papers and belongings. (IVth Amendment to the United States Constitution.) And that a citizen may not be deprived of life, liberty or property without due process of law. (Vth Amendment.)

The broadest statement is by the New Jersey Supreme Court where it held "It is now well settled that the right of privacy

having its origin in natural law is immutable and absolute, and transcends the power of any authority to change or abolish it." McGovern v. Van Riper 137 N. J. Eq. 24. Court restrained the dissemination of finger prints to the state Bureau and to other states, before conviction of McGovern.

However, the rule is not absolute as it sounds even in New Jersey. It has been held that where a citizen was arrested and fingerprinted, though no charges were brought against him, the fingerprints would not be returned to the citizen after his release as fingerprinting was held to be proper police procedure in the administration of justice (Barttella v. McFeeley, 107 N. J. Eq. 141) and where a person was arrested and his picture hung in the "rogues" gallery, the court for the same reason refused to order his photograph returned to him after his acquittal, Ferincola v. Keenan, 106 N. J. Equity 9. Nor was dissemination of fingerprints and photographs enjoined where a citizen had been acquitted of the crime charged against him, the court holding that where one enters into society he gives up a part of his natural liberty as the price of so valuable a boon. He obligates himself to conform to those laws which the community has thought proper to establish, otherwise there would be no security to any individuals in any of the enjoyments of life. It reasoned from this premise that the retention and dissemination of said fingerprints was proper police procedure and would not be enjoined. McGovern v. Van Rippner, 140 N. J. Eq. 341.

In the above case, 140 N. J. Eq. 341, the court on page 345 quotes from Pine v. Okzewski, 112 N. J. Law 429, as follows:

"Changing conditions necessarily impose a greater demand upon that reserve element of sovereignty called the police power, for such reasonable supervision and regulation as may be essential for the common welfare. Acceptance of restrictions upon the so called natural rights of every individual necessary to insure observance by the individual citizen of the duty to use his property and exercise his rights and privileges with due regard to the personal and property rights and privileges of others, is the first and most imperative obligation entering into what we call the social compact. Without it there can be no such thing as organized society or organized government."

This actually reversed the same case in 137 N. J. Eq. 24, above quoted and affirmed the Barttella and Ferincola cases also quoted above. (see p. 347.)

The classic example of the violation of a person's right of privacy is found in McDaniel v. Coca Cola Bottling Co., 60 Ga. App. 92. In this case the plaintiff had brought an action

against the defendant for personal injuries and was confined to a hospital, where the defendant listened in on plaintiff's conversation and tape recorded the same. The court held this was an invasion of plaintiff's right of privacy for which damages could be allowed.

The intrusion is generally for the purpose of obtaining news or is for other commercial uses. This lead to the development of said right. State v. Tyndall, 66 N. E. 2d. 275-8 (Indiana).

Various state courts, notably New York and Rhode Island, deny that there exists any such right. These are set forth in 41 Am. Jur. Sec. 7, p. 929 and 54 C. J. 816. But in every case involving an assertion of the right of privacy, the court is called upon to resolve the conflict between the rights of the individual on the one hand and the interest of society on the other. 138 A. L. R. 45.

This conflict is nicely put by the following:

"The courts on the one hand have been asked to uphold the right of free speech, the right of society to know the truth, the right to make full use of the wonders of modern civilization which spread intelligence instantaneously to the farthest end of the earth, while on the other hand they are urged to protect the sensibilities of the individual from the brash and vulgar attention of the mob, to fence off a small corner of human existence against the predatory advances of selfish commercial interests." "The Right of Privacy; a Half Century's Development," 39 Mich. Law Review, 526, 529.

Wire tapping is prohibited by Federal Statutes while peeping toms have always been denounced by the law. Though not referred to as the right of privacy that is actually what the law protects. But this right is very much circumscribed so .that each case must be decided on its own facts with both the private right and public interest in mind.

III. Our Supreme Court as far as both court and counsel have been able to find, has not considered the term—right of privacy—as such. Our Cuyahoga County Court of Appeals decided in **Johnson v. Publishing Company, 18 O. O. 372, 32 Abs 423,** that it will not enjoin the publication of names on a nominating petition filed with The Board of Elections. Judge Hurd, in a dicta, however, recognizes the right of privacy in one's name and use thereof. He further held that the plaintiff had waived such right when said petitions were filed with the Board of Elections, thus becoming public property.

In **Friedman v. Restaurant Employees, 20 O. O. 473,** the Hamilton County Common Pleas Court granted an injunction against the photographing of customers and their automobiles

when they crossed the picket lines of striking employees and went into the restaurant of the plaintiff. He held that the customers had a right of privacy in their own likeness and the same could not be taken and published.

In **Martin v. F I V Theater Co., 10 O. O. 338, 26 Abs 67,** our own Common Pleas Court (Judge Merrick) refused an injunction against the publication of a photograph of an actress since an actress was in public life.

In the instant case the plaintiff claims she suffered mental anguish because of the acts of the defendant's employees. Mental anguish and shock, as such, has been considered by our reviewing courts. In **Miller v. R. R. Co., 78 Oh St, 309,** the evidence showed that the railroad had a yard running along a city street of Chillicothe, Ohio, and across said street the plaintiff owned a home. She alleges in the first cause of action of her petition against the railroad company that the company was guilty of negligence in failing to have at the western termini of said tracks a bumping post or a suitable device for preventing cars from being run or shoved off said western termini, and because of said failure a car of said defendant was run past the termini, across the street and into her home, damaging it to the extent of $300.00.

As a second cause of action, plaintiff alleges that at the time the car was shoved across the street she was standing within a few feet of the point where said car struck said dwelling. The shattering of the house shattered her nerves and her whole nervous system. The shock caused her great bodily pain and mental anguish, and permanent injury to her person and health. A demurrer to the second cause of action was sustained, the court holding that no liability exists for acts of negligence causing mere fright or shock unaccompanied by contemporary physical injury, even though subsequent illness results, when the negligent acts complained of are neither willful nor malicious. That decision has been uniformly followed in Ohio.

However, a case of liability for fright and mental suffering was made out in **Traction Co. v. Rosnagle, Etc., 84 Oh St 310.** Here a ten year old boy got on the defendant's street car at night to go to his home some distance outside the City of Wilmington; when the car had reached about the end of the city limits the boy offered a nickel for his fare. The conductor refused to accept the nickel since it was somewhat defaced. The child having no more money was put off the car. He was very much frightened but later found his way to a home some distance from the car tracks and eventually reached his own home. Suit was brought in his behalf for

the fright and the mental anguish that he suffered and in the trial it was proven that the nickel though defaced was good legal tender. The court held that the ejectment was wrongful, intentional and willful, and where the mental suffering and fright and terror naturally ensue as in said case, a recovery therefor will be upheld.

In the case of **Rose Co. v. Laughry, 33 Oh Ap, 488,** the complaint was that the holder of a chattel mortgage on household goods had broken and entered plaintiff's dwelling house and removed furniture and that the act was willful, intentional and wanton. In that case the Fifth Circuit Court of Appeals held that the buyer was entitled to compensatory damages for the humiliation, injury to feelings and mental sufferings which she sustained resulting normally and necessarily from the wrongful act of entering. However, the same court held that where . a plaintiff's sister was beaten to death and her mutilated body was placed in a position where the plaintiff would come across it, and that later when the plaintiff did see the body and became frightened and so shocked in her nervous system that she became ill, she could not recover even when the shock sustained was the result of a willful and wrongful act, ."unless such act was directed toward the person or property of the one seeking recovery. Injuries to a third person cannot be the basis of recovery for shock or fright suffered by the complainant."

So we see that by decisions of our own state courts the right to recover where no personal injury occurs extends to those cases where the act which brought about the mental anguish was wrongfully, willful and intentional, but does not extend to cases where the act was merely a negligent act. In the latter cases there must be a physical injury connected therewith before a recovery may be had for the said shock to one's nervous system.

In the instant case the plaintiff suffered mental anguish. She testified that after the revelation that the company's operator had listened in on her calls, she had a splitting headache and actually became sick. This certainly was not from fright but first from remorse which worked itself up to anger because she had been frustrated in her scheme to use both 'phones indiscriminately to her financial advantage. She is an educated woman, very intelligent but the go-getter type. She was candid in her testimony and admitted she set out to get telephone service to which she knew she was not entitled,—in other words to beat the company. The fact that she did not commit perjury on the witness stand but admitted her scheme to outwit the company, is the only redeeming

feature of her whole testimony. Though educated and intelligent, her mental attitude is like that of too many people who think nothing of beating the government or any public utility.—There is plenty of money behind these institutions, they falsely reason, and therefore anything they can get out of them right or wrong, is permissible.

The plaintiff verbally and in her application agreed to abide by the regulations of the company. The tariffs were filed with the Public Utilities Commission of Ohio and approved by it. They have therefore the force of law and all users of its service are charged with notice thereof. The company then must charge everyone on the same basis. **Erie R. R. Co. v. Steinberg, 94 Oh St 189.**

If the company does not give all users the same treatment, —the same rate,—its conduct is discriminatory. It may be conceded that if one telephone user pays $6.00 a month for 85 business calls and another has a far greater number of calls for business on a party line which should not be so used, and pays only $4.05, discrimination results.

The requirements of §614 et seq., GC, are rigorous and explicit as to what the company must do and refrain from doing in order that the public will be protected against excessive rates and discrimination. The public interest required the company to follow the commands of the law and the approved regulations and to offer the same service to all. **Building Industries v. P. U. C. O., 150 Oh St 251.**

It will be remembered that years ago, passes were issued by the railroads to a favored few permitting such persons to travel free. Also rebates were given to favored shippers in order to get their business. When I was a boy in a mining town in south eastern Ohio, coal was shipped from West Virginia to the lakes cheaper than it could be shipped from our Ohio mines. No longer is it so as the Interstate Commerce Commission under the law has put a stop to such practice.

The defendant corporation, a creature of our statutory law, must be diligent in its obedience to those laws, otherwise penalties will be visited upon it. Pursuant to the commands of §644 et seq., GC, and the tariffs and regulations approved by Public Utilities Commission of Ohio, defendant's servants employed the methods at hand for the purpose of detecting the unscrupulous who sought to attain an undue advantage of the company and the rest of the telephone using public.

It is not denied by the plaintiff that these employees of the defendant were quite within their rights in monitoring said plaintiff's line by the use of a pen register. When they found the calls on the unmetered line to be excessively high, what

were they to do? To stop there, when they morally were convinced, and justifiably so, that the line was being used for business, would have made their effort a useless one. They pursued the only additional method available to them,—they manually monitored the telephone. This was done in the least ostentatious way possible, in a closed room, and for a short period of time. No publication of their findings was made except by the plaintiff. It was not mentioned even to the plaintiff until she in a brazen way insisted on it.

Counsel for the plaintiff argues that plaintiff's unethical conduct is no excuse for the defendant's violation of plaintiff's right of privacy. Generally it is true that the wrongful act of one party towards another does not authorize the other party to do a wrongful act towards the first. But every right has its correlative duty. The plaintiff had the right to use her telephones in the manner agreed upon and as provided by law. The defendant in the instant case then had the right and duty to see to it that she used them in just that way. For such shameful conduct on the part of a woman of her education, this Court cannot grant her an accolade nor permit the jury to grant her $150,000.00 which she claims as damages; nor allow said jury to speculate on any other sum.

This Court concludes that by their agreement and under the law the defendant had the right and duty to supervise its service and the right and duty to investigate suspicious misuse of said service. It had reasonable grounds to believe from the actions and words of the plaintiff prior to the installation of the unmetered telephone, coupled with the abnormal number of calls made thereon by the plaintiff, that said home telephone was being used for business purposes. Both the public interest and its own interest required the manual monitoring of said telephone. The officers of this company should be commended and not rebuked for following up the discovery from the pen register with the means at hand.

Having come to the conclusion that there was no wrongful act performed by the defendant, and that no error intervened, plaintiff's motion for New Trial will be overruled. Plaintiff will be saved her exceptions.