(62 South. 660.)

No. 19,974.

SCHWARTZ et al. v. EDRINGTON, Judge.

In re SCHWARTZ et al.

(June 9, 1913.  Rehearing Denied June 30, 1913.)

*(Syllabus by the Court.)*

CONSTITUTIONAL LAW (§ 90*)—CONSTITUTIONAL GUARANTIES—FREE SPEECH AND PUBLICATION — SIGNERS OF PETITION — "LIBERTY OF SPEECH AND OF THE PRESS."

The privilege of free publication, guaranteed by the Constitutions of the United States and of this state has its limitations.  It does not, for instance, include the right to publish the private letters or copyrighted compositions of another, obscene matter, lottery advertisements, or notices used as instrumentalities for making effective a boycott which has been enjoined under the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) or some other matters that might be mentioned.  Under the state Constitution, "any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty," but that grant does not include the right to publish what purports to be a signed petition, as expressing the sentiments, not of the publisher, but, of the signers, after the signers have disowned and repudiated it, as having been signed under a misapprehension; and the continued publication of the names of such signers, in that connection, may be enjoined, and the parties violating the injunction may be punished for contempt of the court by which it was issued.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 172; Dec. Dig. § 90.*

For other definitions, see Words and Phrases, vol. 5, pp. 4131–4133; vol. 8, p. 7706.]

Application by David Schwartz and others for writs of certiorari and prohibition against Prentice B. Edrington, Judge, to review an order sentencing relators for contempt in violating an injunction.  Application dismissed.

F. A. Middleton and R. H. Marr, both of New Orleans, for relators.  J. E. Fleury, of New Orleans, for defendants and respondents.

MONROE, J.  Relators allege that, at the instance of certain persons, whom they name, the judge of the Twenty-Eighth judicial district court issued an injunction prohibiting them and the Jefferson Voice Publishing Company, Limited, from publishing the names of said persons, "as petitioners for incorporation of the village of Gretna in the parish of Jefferson, in the Jefferson Voice, a newspaper published in the parish of Jefferson, and from further publishing the names of said parties under the heading of the petition to incorporate the village of Gretna"; that the publication thus referred to "was made in pursuance of Act No. 136 of 1898, and in obedience to section 11 of said act, and that the Twenty-Eighth judicial district court was absolutely without power, jurisdiction, or authority to issue said injunction"; that relators did not obey the injunction, but made the publication as though it had not been issued, and were ruled to show cause why they should not be punished for contempt, and, after hearing, were sentenced to imprisonment for so doing; wherefore, they pray for writs of certiorari and prohibition, etc.

Act 136 of 1898, §§ 11 and 12, provide that, whenever a petition, signed by two-thirds of the electors of a village, setting forth certain facts and praying that the village be incorporated, shall be presented to the Governor, and he shall be satisfied in certain respects, and, among others, that the petition has been published for three weeks, he shall declare the village incorporated and appoint the officers; and it appears that the plaintiffs in the injunction here in question had signed such a petition and that it was in course of publication when they appealed to the court to prohibit the further publication, on the ground that they had affixed their signatures—

"with the understanding that there would be an election held to elect the first officials, and that the Governor would appoint, as the first officials, the persons receiving the majority of votes for the respective offices, elected at said election"; but, "that, since the movement to incorporate started, the proposition to allow the electors to take part and vote at an election for the first officials of the proposed municipal-

ity has been entirely eliminated, and the parties in charge of the petitions propose to have the territory described in said annexed petition incorporated, without having an election to elect the first officials, which will be tantamount to a recommendation to the Governor of this state of the parties whom the qualified electors desire as their first officers, and that the parties in charge of said petitions intend to have said officers appointed without consultation or consent of the voters of the proposed municipality. * * *

"Petitioners further allege that the Jefferson Voice Publishing Company, Limited, David Schwartz, Arthur E. Stone, and Charles F. Gelbke, or either of them, are causing to be published in the Jefferson Voice, a newspaper published in this parish a petition for incorporation of the proposed village of Gretna, on which said petition there appear the names of your petitioners; that, although the parties who solicited your petitioners' signature to said petition have been duly notified that petitioners desire to withdraw their names from said petition, and that petitioners are not in favor of incorporation of the said town without having a voice in the selection of the first officials, through an election duly held for this purpose, as originally and generally understood, nevertheless, the said newspaper and the parties herein named have published, and continue, and will continue to publish petitioners' names in said newspaper as petitioners for incorporation, unless they are restrained from so doing."

Petitioners prayed that an injunction issue, prohibiting the further publication of their names "as petitioners for incorporation of the village of Gretna"; and the injunction issued accordingly.

The respondent judge, by way of return to the alternative writ issued from this court, says (among other things):

"The allegation, in the plaintiffs' petition, that the defendants were using their names in a certain way, under a certain heading, in the Jefferson Voice, * * * without the consent of the petitioners, and that such use of their names was an invasion of their right of privacy, clearly entitled the plaintiffs to the writ of injunction, and I accordingly issued the order."

The question to be decided is whether, upon the whole case as thus presented, the respondent judge was vested with jurisdiction to issue the injunction. The first amendment to the Constitution of the United States provides that, "Congress shall make no law * * * abridging the freedom of speech, or of the press;" but that provision, though pregnant with a prohibition directed to the courts, as well as to the lawmakers, has never been construed as inhibiting the issuance of injunctions to restrain publications in certain cases, and the same thing may be said with regard to similar provisions in the Constitutions of the different states.

In Denis v. Leclerc, 1 Mart. (O. S.) 297, 5 Am. Dec. 712, Judge Martin, presiding in the superior court of the territory of Orleans, held that the defendant, who had been enjoined from publishing a private letter, written by the plaintiff, and who had, thereafter, attached the letter to the answer filed by him and, by an advertisement in a newspaper, had invited the public to visit either the clerk's office or his printing office and read it, was guilty of contempt; and, in the course of the able and exhaustive opinion leading to that conclusion, the learned judge said:

"In the United States, by an act of Congress, it is made penal to print the manuscript of another, and the property of the writer is secured from invasion. 1 Laws U. S. 118. This act is expressly extended and declared to be in force and effect in this territory. 7 Laws U. S. 117."

The copyright laws of the United States are not, therefore, within the prohibition of the Constitution, and the press is not free to publish matter protected by them.

In "The Matter of Orlando Jackson," 96 U. S. 727, 24 L. Ed. 877, the Supreme Court of the United States, speaking through Mr. Justice Field, said:

"Nor can any regulations be enforced against the transportation of printed matter in the mail, which is open to examination, so as to interfere in any manner with the freedom of the press. Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value."

But, after quoting from act of March 3, 1873 (chapter 258, 17 Stat. at L. 598), to the effect that no books, pamphlets, papers, prints, or other publications of certain mentioned kinds shall be carried in the mails, the court went on to say:

"All that Congress meant by this act was that the mail should not be used to transport such corrupting publications and articles. * * * The same inhibition has been extended to circulars concerning lotteries—institutions which are suppossed to have a demoralizing influence upon the people."

And it was held that the inhibition last referred to was within the power of Congress.

In the matters of Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, it was held that the continuance of a boycott may be enjoined, though spoken words or written matter are used as the instrumentalities by which it is made effective.

In Laidlaw v. Lear, 30 Ont. 26, it was held that:

"The publication of notes or drafts of private letters, dictated to a stenographer in the ordinary course of business, and, by him, surreptitiously taken from the office and given to a third person who knew how they were obtained, will be enjoined, at the instance of the person who dictated them." 22 Cyc. p. 900, note.

In Mackenzie v. Soden Mineral Springs Co. (Sup.) 18 N. Y. Supp. 240, it was held that:

"A physician may enjoin the advertising of an unauthorized recommendation of a medicinal preparation under his name, on the ground that such publication is injurious to his professional reputation, and an infringement of his right to the use of his name, and prejudicial to the public interest." 22 Cyc. p. 900, note.

The Louisiana Constitution of 1879 contained a provision very similar to that contained in the Constitution of the United States, to wit:

"Art. 3. No laws shall be passed * * * abridging the freedom of speech, or of the press. * * *"

And, construing that article, it was held by this court, in State ex rel. Liversey v. Judge, 34 La. Ann. 741, that (quoting from the syllabus):

"By our Bill of Rights, the 'press' is free from all censorship over what shall be published, and entirely exempt from control, in advance, as to what shall appear in print. Courts in this state are therefore absolutely without authority to control in advance or to restrain by injunction, the liberty enjoyed by the 'press' to publish what even may be of a libelous nature, the party injured having his remedy *after* the publication."

The question presented for decision in the case thus cited was whether the relators had been properly condemned to imprisonment for contempt of court for having violated an injunction prohibiting them from publishing certain "false, malicious, and libelous cartoons and editorial paragraphs," to the alleged irreparable injury of the applicant for the writ. When, therefore, the court had decided that the courts of this state are without authority to enjoin the publication of a libel, and, hence, without authority to punish the violation of such an injunction, it had decided the only questions that were before it, and in so far as the opinion and the syllabus go beyond those questions they are obiter dicta.

The weight of authority in England and in this country no doubt, sustains the doctrine applied by the court to the questions presented for decision. Whilst, however, it is true that the privilege of free publication seems thus to be held paramount, to that extent, to some other rights and "blessings," to secure which the government was established, it remains, nevertheless, that, according to the same weight of authority, that privilege has its limitations. It does not, for instance, include the right to publish the letters or copyrighted compositions of another person, or obscene matter, or lottery advertisements, or notices in aid of a boycott which has been enjoined, under the "Sherman Act."

In Dailey v. Superior Court, etc., 112 Cal. 94, 44 Pac. 458, 32 L. R. A. 273, 53 Am. St. Rep. 160, it was held by the Supreme Court of California that:

"The production in a theater of a play based upon the facts of a criminal case then on trial, although it may interfere with the administration of justice and deprive the accused of a fair trial, and may constitute a punishable contempt, cannot be restrained by injunction, under Const. art. 1, § 9, declaring: 'Every citi-

zen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right.' "

In a note appended to the decision thus referred to (32 L. R. A. 273), it is said (among other things):

"The court in the above case assumes that the theatrical representation involved a speaking of the 'sentiments' of the author. Even if this is conceded, it would seem doubtful if the mere publication of a false statement of alleged fact involving no comment, criticism, or expression of opinion could be called a speaking of 'sentiments,' or come within this constitutional guaranty."

The criticism thus quoted is particularly applicable in the instant case, since the question here at issue arises, not under the Constitution of 1879 which declared merely, that "no law shall be passed * * * abridging the freedom of speech, or of the press," but under the present Constitution, which declares that:

"Art. 3. No law shall ever be passed to curtail or restrain the liberty of speech or of the press; any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

The second clause of the sentence thus quoted explains and modifies the first; for, whereas the first refers to "the liberty of speech and of the press," without defining "the liberty," the second explains its meaning in saying "any person may speak, write and publish his sentiments on all subjects," etc., which saves the article from conflict with the laws of the United States penalizing the publication of the copyrighted sentiments of another, and, as it appears to us, excludes from its operation the case now under consideration, since there is no attempt, here, to restrain the relators from publishing their sentiments. What they were enjoined from doing was the publication of a petition purporting to be signed by, and which was, in fact, signed by, the plaintiffs in injunction, and purporting to be their petition, but which was not their petition,

because, having signed it under a misapprehension, they disowned and repudiated it, and no longer desired that to be done which it was the purpose of the petition to accomplish. And, the publication, not being an exercise by relators of the privilege of publishing their sentiments, but being an unauthorized use by them of a composition purporting to represent the sentiments of the signers was, as to the use of their names, under the control of the signers.

We therefore conclude that the respondent judge acted within the limits of his lawful authority in issuing the injunction and in calling relators to account for disobeying it.

This application is, accordingly, dismissed at relator's cost.