**George MENDONSA, Plaintiff,**

**v.**

**TIME INCORPORATED, Defendant.**

**C.A. No. 87–0371 L.**

United States District Court,
D. Rhode Island.

Feb. 23, 1988.

Corcoran, Peckham & Hayes, P.C., Patrick O'N. Hayes, and Kathleen Managhan, Newport, R.I., for plaintiff.

Knight Edwards, and Mark P. Dolan, Edwards and Angell, Providence, R.I., for defendant.

## OPINION AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on the motion of defendant, Time Incorporated

(Time), to dismiss this action for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The focal point of this action is a photograph taken by Alfred Eisenstadt on V–J Day, August 14, 1945. According to the allegations contained in the amended complaint, the photograph depicts a sailor kissing a nurse in New York City's Times Square moments after the announcement of the Japanese surrender. In the photograph the sailor is bent over, and a portion of his face is visible. The photograph also depicts several other people in Times Square on that day. Since its initial publication in the August 27, 1945 issue of *Life Magazine*, the photograph has become very well known, and has been republished in *Life Magazine* and other publications on several occasions.

In August 1980, the editors of *Life Magazine* ran a copy of the photograph and solicited individuals claiming to be the sailor and the nurse to contact the magazine. Plaintiff, George Mendonsa, responded to this solicitation. He told the editors that, from personal experience as well as from a number of identifying circumstances in the photograph itself, he knew that he was the "kissing sailor." The magazine, however, made no formal attempt to identify the sailor.

In April 1987, *Life Magazine* ran an advertisement in which it offered to sell readers copies of the "kissing sailor" photograph for $1,600 each. Shortly thereafter, Mendonsa filed the present suit in Rhode Island Superior Court against the publisher, Time. The complaint sought compensatory damages and injunctive relief for "misappropriation of likeness" under R.I. Gen.Laws § 9–1–28.1(a)(2) (1985).

Time removed the case to this Court and moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim under Section 9–1–28.1(a)(2). On September 4, 1987, plaintiff objected to this motion and amended his complaint to add a cause of action under R.I.Gen.Laws § 9–1–28 (1985). On September 24, 1987, Time replied that Section 9–1–28.1(a)(2) and Section 9–1–28 confer "identical" rights and that, therefore, its arguments in support of dismiss-

ing the original complaint equally support dismissing the amended complaint. The Court heard arguments on the motion to dismiss and the matter was taken under advisement. The motion is now in order for decision.

When considering a motion to dismiss under Fed.R.Civ.P. 12b(6), the Court must accept all the facts pleaded as true and draw all inferences from those facts in the light most favorable to the nonmoving party. *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir.1976); *Seveney v. United States*, 550 F.Supp. 653, 655 (D.R.I.1982). If it appears beyond doubt from the pleadings that the party opposing the motion can prove no set of facts which would support a claim for relief, the motion to dismiss should be granted. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed. 2d 90 (1974); *Melo-Tone Vending Inc. v. United States*, 666 F.2d 687, 688 (1st Cir. 1981); *Newport National Bank v. United States*, 556 F.Supp. 94, 95 (D.R.I.1983). Applying this standard, and thereby assuming that all the allegations in the amended complaint are true, this Court holds that plaintiff has stated a cause of action under Section 9–1–28 but not under Section 9–1–28.1(a)(2). To understand the relationship between these two seemingly identical or overlapping statutes, it is necessary to first examine the origins of the "Right to Privacy" and the events leading up to the relatively recent enactments of Section 9–1–28 and Section 9–1–28.1(a)(2).

## The Origins of a "Right to Privacy"

The invasion of the right to privacy was articulated as a separate tort in a famous article by Samuel D. Warren and Louis D. Brandeis. *See generally* S. Warren and L. Brandeis, *The Right to Privacy*, 4 Harv.L. Rev. 193 (1890). In their article the authors concluded that a common law right to privacy, essentially a right "to be let alone," was entitled to explicit recognition because the substance of the right already was protected under the law of property, defamation and contracts.

Initially courts declined to recognize this "new" tort. For example, in *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538,

64 N.E. 442 (1902), the New York Court of Appeals dismissed a suit for invasion of privacy brought by a young woman whose picture was placed on 25,000 posters advertising defendant's flour. The Court. declared that there existed no right of privacy enforceable at law or in equity. In response to *Roberson*, the New York State legislature enacted section 51 of the Civil Rights Law. Section 51 provides:

> Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without [his] written consent ... may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner ... the jury in its discretion may award exemplary damages.

N.Y.Civil Rights Law § 51 (McKinney Supp.1988).

Three years later, in *Pavesich v. New England Life Insurance Co.*, 122 Ga. 190, 50 S.E. 68, 81 (1905), the Supreme Court of Georgia recognized a common law right to privacy where the defendant published plaintiff's name and picture to advertise its insurance services. The Court held that "the publication of one's picture without his consent by another as an advertisement, for the mere purpose of increasing the profits and gains of the advertiser, is an invasion of [the] right [of privacy]." Following *Pavesich*, many courts soon recognized a common law right to privacy in cases of misappropriation of name or likeness for commercial purposes. Several jurisdictions also recognized a common law right against misappropriation of likeness for noncommercial purposes. *See, e.g., State ex rel. LaFollette v. Hinkle*, 131 Wash. 86, 229 P. 317 (1924) (use of name as candidate by political party); *Hinish v. Meier & Frank Co.*, 166 Or. 482, 113 P.2d 438 (1941) (name signed to telegram urging governor to veto a bill); *Schwartz v. Edrington*, 133 La. 235, 62 So. 660 (1913)

(name signed to petition); *Hamilton v. Lumbermen's Mut. Cas. Co.*, 82 So.2d 61 (La.App.1955), *appeal transferred*, 226 La. 644, 76 So.2d 916 (1955) (advertising in name of plaintiff for witnesses of accident); *Burns v. Stevens*, 236 Mich. 443, 210 N.W. 482 (1926) (posing as plaintiff's common law wife); *Vanderbilt v. Mitchell*, 72 N.J.Eq. 910, 67 A. 97 (1907) (birth certificate naming plaintiff as father).

In the years that followed, the courts expanded the common law right to privacy considerably. In 1971 noting that much debate has always existed over the definition and scope of the "right to privacy," Professor Prosser categorized four distinct kinds of invasions: (1) intrusion upon one's physical solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places someone in a false light in the public's eye; and (4) appropriation of one's name or likeness for another's benefit. W. Prosser, *Law of Torts*, § 117 (4th Ed.1971). The American Law Institute (ALI) has adopted this formulation as its general statement of the law. *See Restatement (Second) of Torts*, § 652A (1977). In turn, courts have widely adopted the Restatement formulation as the common law rule in their jurisdiction. *See, e.g., Lawrence v. A.S. Abell Co.*, 475 A.2d 448 (Md.1982), *Tellado v. Time–Life Books, Inc.*, 643 F.Supp. 904 (D.N.J.1986); *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580 (D.C.App.1985).

### The "Right to Privacy" in Rhode Island

In the early years of this century, the Rhode Island Supreme Court declared that there was no common law right to privacy in Rhode Island. *Henry v. Cherry & Webb*, 30 R.I. 13, 73 A. 97 (1909). The *Henry* Court held that there could be no recovery of damages in an action based on an invasion of an alleged right to privacy in an action against a merchant who had published a newspaper advertisement containing a picture of plaintiff seated in an automobile. Although the Court noted that the advertisement was made without the knowledge and consent of the plaintiff, made plaintiff the object of ridicule and caused him great mental anguish, it stated

that it was unable to discover at common law that an invasion of privacy was actionable. The Court further stated that if the right to privacy should become necessary or desirable, it would be the function of the legislature to insure this right. Inaction on the part of the legislature, however, could not confer that function on the judiciary.

For 63 years following the *Henry* decision, the Rhode Island General Assembly failed to recognize any cause of action for the invasion of privacy. In 1972 this Court (Pettine, J.) was asked to recognize a cause of action for invasion of privacy in *Gravina v. Brunswick Corp.*, 338 F.Supp. 1 (D.R.I.1972). In *Gravina*, plaintiff claimed that she had recently set a world record score of 253 pins in duckpin bowling and that defendant, a bowling pin manufacturer, had widely distributed her photograph promoting defendant's bowling pins without her consent. The Court, sitting in a diversity case, noted the lack of any common law right of privacy in Rhode Island:

> The holding of *Henry*, "that a person has no right of privacy for the invasion of which an action for damages lies at common law," is clear and unequivocal. The *Henry* court left it to the legislature to provide for an actionable right of privacy if it is so desired. To this date, the legislature has not shown any such desire, and *Henry* stands as the only existing Rhode Island authority on the right of privacy.

*Id.* at 2–3.

Three months later, the Rhode Island General Assembly responded by enacting legislation providing for both injunctive relief and damages for the unauthorized commercial use of the name, portrait or picture of any person. R.I.Gen.Laws § 9–1–28 (1985). The statute provides in part:

> Any person whose name, portrait or picture is used within the state for advertising purposes or for the purposes of trade without his written consent may bring an action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof, and may recover damages for

any injuries sustained by reason of such use.

Section 9–1–28 closely resembles Section 51 of the New York Civil Rights Law and was apparently modeled after that New York statute.

Seven years later, in *Kalian v. People Acting Through Community Effort, Inc.*, 122 R.I. 429, 408 A.2d 608 (1979), the Supreme Court of Rhode Island was invited to recognize as a general principle of law that the invasion of one's privacy by another is subject to liability and damages for resulting harm. The Supreme Court noted that, although the four strands of the right to privacy described in the Restatement had been widely recognized in many jurisdictions when Rhode Island enacted Section 9–1–28, the Legislature "saw fit to limit this right only to protection against the unauthorized use of name, portrait or picture for commercial advantage." *Id.* 408 A.2d at 609. "It can therefore be inferred," the Court stated, "that the Legislature deliberately excluded the other three strands when § 9–1–28 was enacted." *Id.* The following year the Rhode Island General Assembly enacted Section 9–1–28.1. This statute recognizes the four causes of action set forth in Section 652A of the Restatement.

*Causes of Action under Section 9–1–28 and Section 9–1–28.1(a)(2)*

Mendonsa proceeds here under Section 9–1–28 and Section 9–1–28.1(a)(2). To determine whether Mendonsa has stated a cause of action under these statutes, this Court under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), must make an informed prediction as to how the Rhode Island Supreme Court would rule on these questions if the case were to come before it. This task is complicated because the Rhode Island courts have yet to interpret these relatively new statutes. Interpretation of these causes of action requires a careful reading of Sections 9–1–28 and 9–1–28.1, review of the relevant case law from jurisdictions with similar statutes and a careful analysis of the relationship between the two statutes in Rhode Island's unique statutory scheme.

*Section 9–1–28*

■ By its own terms, Section 9–1–28 provides a cause of action for "any person" whose "name, portrait or picture" is used within the state for "advertising purposes" or for the "purposes of trade" "without his written consent." The statute further provides that such a person may recover damages "for any injuries sustained by reason of such use" and that the court may award treble damages if the defendant "knowingly used the name, portrait or picture in an unlawful manner."

To make out a violation, then, plaintiff must prove three distinct elements:

(1) use of his name, portrait, or picture

(2) without written permission.

(3) for advertising or trade purposes.

*See Allen v. National Video Inc.*, 610 F.Supp. 612 (S.D.N.Y.1985) (applying similar New York law). Here, plaintiff's amended complaint alleges that Time has, without his consent, used his picture in Time's various publications and has also offered to sell a limited edition of his picture for $1,600 each. Thus, plaintiff's amended complaint clearly alleges the first two elements set out above. Whether plaintiff has satisfactorily alleged the third element requires further analysis because the statute does not itself define the phrase "for purposes of trade." In construing that phrase, the Rhode Island Supreme Court would, in all probability, look to the large body of New York law interpreting similar language in Section 51 of the New York Civil Rights law after which Section 9–1–28 is clearly modeled. *Laliberte v. Providence Redevelopment Agency*, 109 R.I. 565, 288 A.2d 502 (1972).

The New York courts have held that to prove "trade purposes" a plaintiff must present evidence of "commercial exploitation." *Novel v. Beacon Operating Corp.*, 86 A.D.2d 602, 446 N.Y.S.2d 118 (1982) (tenant cannot recover under civil rights law against landlord); *See also Cardy v. Maxwell*, 9 Misc.2d 329, 331–32, 169 N.Y.S.2d 547, 550–551 (N.Y.Sup.Ct.1957). In *Cardy* the court held that the use of a name to extort money was not a use "for purposes of trade" within the meaning of the statute because it did not involve *commercial* exploitation:

Sections 50 and 51 of the Civil Rights Law were, as their language clearly indicates, designed to prevent *commercial* exploitation of a person's name, portrait or picture. Had the Legislature intended to prohibit unauthorized use of a person's name or picture for purposes of all gain, it could easily have so provided. The statute was obviously aimed at exploitation for purposes of commerce.

*Id.* (emphasis in original).

Applying Section 51 in the context of all commercial uses, however, would clearly violate the First Amendment. To avoid such a conflict, the New York courts have consistently emphasized that activities involving the dissemination of news or information concerning matters of public interest are privileged and do not fall within "the purposes of trade" contemplated by Section 51, despite the fact that they are carried on for profit. Thus, the New York courts early held that the use of a name or picture in a newspaper, magazine, or newsreel, in connection with an item of news of one that is newsworthy, is not a use for "purposes of trade" within the meaning of the Civil Rights law. *See Gautier v. Pro-Football, Inc.*, 304 N.Y. 354, 107 N.E.2d 485 (1952).

The scope of the subject matter which may be considered of "public interest" or "newsworthy" has been defined in most liberal and far reaching terms. As one New York Court has noted, "The privilege of enlightening the public is by no means limited to the dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general." *Paulsen v. Personality Posters, Inc.*, 59 Misc.2d 444, 448, 299 N.Y.S.2d 501, 506 (N.Y.Sup.Ct.1968). The privilege, however, is not without limitation. As the New York Court of Appeals has stated, "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege

does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information." *Gautier v. Pro Football, Inc.*, 304 N.Y. 354, 107 N.E.2d at 488.

Several New York cases cited in *Gautier*, illustrate this principle. In *Redmond v. Columbia Pictures Corp.*, 277 N.Y. 707, 14 N.E.2d 636 (1938), plaintiff, a professional golfer, had been photographed for newsreel purposes to which no objection was made. The film was later sold and used as part of short feature pictures portraying sports in a humorous manner. The films were distributed for profit in numerous movie theaters. The New York Court of Appeals held that the use was "for purposes of trade" within Section 51. *See also Franklin v. Columbia Pictures Corp.*, 246 A.D. 35, 284 N.Y.S. 96 (1935) *aff'd*, 271 N.Y. 554, 2 N.E.2d 691 (1936).

In *Blumenthal v. Picture Classics*, 235 A.D. 570, 257 N.Y.S. 800 (1932), *aff'd without op.* 261 N.Y. 504, 185 N.E. 713 (1933), a movie company filmed a picture entitled "Sightseeing in New York with Nick and Tony" which it distributed to various movie theaters. Six seconds of the film consisted of closeup, full-size views of plaintiff, a street vendor, selling bread and rolls. The Court held that this use of the plaintiff's picture was for "purposes of trade."

As the *Gautier* court noted, *Blumenthal* illustrates the area of privacy which may not be invaded:

> One traveling upon the public highway may expect to be televised, but only as an incidental part of the general scene. So, one attending a public event such as a professional football game may expect to be televised in the status in which he attends. If a mere spectator, he may be taken as part of the general audience, but may not be picked out of the crowd alone, thrust upon the screen and unduly featured for public view.

*Gautier*, 107 N.E.2d at 489.

In the present case, Mendonsa claims that the initial and subsequent publication of his photograph as well as Time's recent sale of a limited edition of the photograph for $1,600 each constituted use "for the purposes of trade" within the meaning of Section 9–1–28.

The original publication of the photograph in 1945 shortly after V.J. day clearly had significance as news because it contributed information about the recent surrender of the Japanese and the reaction of Americans to it. As the preceding analysis of New York law demonstrates, Time's initial publication of the photograph cannot be deemed a use for "purposes of trade" within Section 9–1–28.

Plaintiff has also alleged, however, that since the initial publication, the photograph has been "published and publicly distributed in Life Magazine and other publications on numerous occasions." From these allegations alone, the Court cannot conclude that these publications had significance as news. Moreover, Time's recent attempt to sell the photograph in a limited edition for $1,600 clearly had a commercial purpose apart from the dissemination of news. Whether these more recent uses functioned primarily as a means of commercial exploitation or served some other protected public interest is a matter that will have to be decided after a full development of the facts. At this stage, viewing the allegations in the light most favorable to the nonmoving party, it appears that plaintiff has adequately alleged that his picture was used for "purposes of trade" within the meaning of Section 9–1–28. Consequently, Mendonsa has stated a cause of action under that statute.

*Section 9–1–28.1(a)(2)*

■ Mendonsa also seeks relief under section 9–1–28.1(a)(2). Section 9–1–28.-1(a)(2) recognizes the "right to be secure from an appropriation of one's name or likeness." The statute further provides:

(A) In order to recover for violation of this right, it must be established that:

(i) The act was done without permission of the claimant;

(ii) The act is of benefit to someone other than the claimant;

(B) It need not be established that there was any publication.

In Defendant's Reply Memorandum, it is stated that "the right conferred by R.I. Gen.Laws § 9-1-28 (and New York Civil Rights Law § 51) is, in actuality, identical to that right conferred by R.I.Gen.Laws § 9-1-28.1(a)(2)." This Court declines to adopt such a construction because it would render Section 9-1-28.1(a)(2) redundant. The Rhode Island Supreme Court would not conclude that the General Assembly acted without purpose in enacting Section 9-1-28.1(a)(2). *Preservation Soc. of Newport County v. Assessor of Taxes of City of Newport,* 99 R.I. 592, 209 A.2d 701 (1965). To avoid creating an unwarranted redundancy, Section 9-1-28.1(a)(2) must be construed in a way that permits it to operate without overlapping the functions of Section 9-1-28.

On its face, the statute appears to protect the appropriation of one's name or likeness for both commercial and noncommercial purposes as long as the appropriation is of "benefit" to someone other than the claimant. As discussed earlier, however, Section 9-1-28, already creates a cause of action for unauthorized uses for commercial purposes. If the General Assembly had intended to include such a cause of action in Section 9-1-28.1(a)(2), it would have repealed Section 9-1-28 because that provision would no longer be necessary. Therefore, it must be concluded that in enacting Section 9-1-28.1(a)(2) the legislature intended only to prohibit the misappropriation of likeness for noncommercial purposes. *See, e.g., State ex rel. LaFollette v. Hinkle,* 131 Wash. 86, 229 P. 317, *supra* (use of name as candidate by political party); *Hinish v. Meier & Frank Co.,* 166 Or. 482, 113 P.2d 438, *supra* (name signed to telegram urging governor to veto a bill); *Schwartz v. Edrington,* 133 La. 235, 62 So. 660, *supra* (name signed to petition); *Hamilton v. Lumbermen's Mut. Cas. Co.,* 82 So.2d 61, *supra* (advertising in name of plaintiff for witnesses of accident); *Burns v. Stevens,* 236 Mich. 443, 210 N.W. 482, *supra* (posing as plaintiff's common law wife); *Vanderbilt v. Mitchell,* 72 N.J.Eq. 910, 67 A. 97, *supra* (birth certificate naming plaintiff as father).

In the present case, Mendonsa claims that Time has used his likeness without his consent for commercial purposes. Mendonsa therefore implicates the rights protected by Section 9-1-28 and not those rights protected by Section 9-1-28.1(a)(2). Accordingly, Mendonsa has failed to state a claim under Section 9-1-28.1(a)(2), but, as concluded above plaintiff has stated a cause of action under Section 9-1-28. Therefore, defendant's motion to dismiss is denied. *It is so Ordered.*