DECISION
The Defendants, Penguin Group (USA) Inc., The Berkley Publishing Group, Rita Frangie and Kristin Del Rosario, have brought a motion before this Court to dismiss Plaintiff's Complaint pursuant to Super. R. Civ. P. 12(b)(6). This motion to dismiss pertains to claims brought before this Court in an action by the Plaintiff, Kenneth Day, seeking civil relief for invasion of privacy under RI. Gen. Law 1956 § 9-1-28.
 I. FACTS AND TRAVEL
There are peripheral facts surrounding the Plaintiff in this action that are truly disturbing. While, at first blush, it would seem that they do not directly bear upon the Defendant's motion, a careful review of pertinent case law indicates that due to the notoriety the Plaintiff gained in relation to these facts, this Court is required to review them in order to properly rule on this motion. *Page 2 
According to the Supreme Court of Rhode Island, on the night of June 8, 2000 Jason Burgeson, then twenty years old, and Amy Shute, then twenty years old, went out in Providence, Rhode Island and met some friends to socialize. After going to a bar and a night club Jason and Amy said goodnight to their friends and sat on the steps of the Arcade, with Jason's car nearby.
At this time a group of five young men comprised of the Plaintiff and four others observed Jason and Amy on the Arcade Steps. According to testimony given in a federal court and recognized by the Supreme Court of Rhode Island as the most detailed account of what transpired that night, the Plaintiff and his associates, after a night of failed robbery attempts, decided to rob and car jack Jason and Amy. State v. Kenneth Day,925 A.2d 962, 970 (R.I. 2007).
While three of the men waited in a car, two of the men approached Jason and Amy and, at gun point, demanded money and forced them to get into Jason's car. Upon starting Jason's car, the two men rendezvoused with the other three where they were waiting. After a brief discussion the two cars proceeded to the Button Hole Golf Course in Johnston, Rhode Island. Id. at 971-2. Once at the golf course the five men argued about what to do next. Testimony indicates that the Plaintiff agreed that they should kill Jason and Amy because they saw his face; the Plaintiff also suggested raping Amy. Id. at 972. Following the discussion the entire group got into Jason's car and left the other car behind as they drove further into the golf course to a more concealed location. Id. During the heated debate about whether or not they should kill Jason and Amy the men took Jason and Amy from Jason's car and made them sit on the ground as they searched the vehicle for valuables (at some point during this argument one of the five men *Page 3 
attempted to leave and for a brief time there was discussion of killing him as well). Id. Ultimately, after one of the men declares "[i]f you're not going to do it, I'm going to do it."Id. at 973. Gregory Floyd, whose testimony the Supreme Court of Rhode Island accepted as the most detailed and credible, fired the gun three times and killed Jason and Amy as the Plaintiff and three others stood by and watched. Id. The men then got into Jason's car and drove off. They were later apprehended.
On December 8, 2000 a federal grand jury indicted the Plaintiff and his four co-defendants with conspiracy to commit a carjacking and carjacking with death resulting. Id. (citing, UnitedStates v. Sanchez, 354 F.3d 70, 73 (1st
Cir. 2004)). Four of the five Defendants accepted plea bargains that spared them the death sentence. Id. The Plaintiff went to trial and was acquitted when the trial judge found the government failed to prove beyond a reasonable doubt that the Plaintiff had the requisite intent to murder Jason and Amy at the time of he carjacking. Id.
On August 29, 2003 the Plaintiff was indicted in Rhode Island state court on nine counts including: one count conspiracy to commit robbery; one count conspiracy to commit carjacking; one count conspiracy to commit murder; two counts of first degree robbery; two counts of carjacking of a motor vehicle resulting in death; and two counts of first degree murder. Id. On June 10, 2004 the Plaintiff was found guilty of all the charges against him.Id. After a motion for a new trial was denied he was sentenced on August 16, 2004 and filed an appeal on August 31, 2004.Id. Pursuant to that appeal, in a lengthy decision, the Rhode Island Supreme Court dismissed both first degree robbery charges and the conspiracy to commit carjacking charge, denied the Plaintiff's request for a new criminal trial and determined that the Plaintiff's sentence of life without possibility *Page 4 
of parole was appropriate. See State v. Kenneth Day,925 A.2d 962 (R.I. 2007).
This motion is before the Court due to actions directly related to the events described above. The Defendants in this case are all parties involved with the creation and publication of the bookThrill Killers. The book depicts the crimes described above, the Plaintiff's involvement in those crimes, the investigation associated with those crimes, the apprehension of the five men and the subsequent prosecution of the Plaintiff and his co-defendants. Defendants Raymond Pingitore and Paul Lonardo authored the bookThrill Killers.[1] (Complaint at ¶ 22, 28). The Berkley Publishing Group, Penguin Group (USA) Inc. and Barnes and Noble published the book Thrill Killers.
(Complaint at ¶ 36, 46, 62). Defendant Rita Frangie designed the cover of the book Thrill Killers and Defendant Kristin del Rosario was the book designer. (Complaint at ¶ 54, 47).
Plaintiff Kenneth Day has brought this complaint stating a claim against the above-named Defendants under R.I.G.L. § 9-1-28 which provides relief for the unauthorized use of name, portrait or picture. In response to Plaintiff's complaint, Defendants Penguin Group (USA) Inc., The Berkley Publishing Group, Rita Frangie and Kristin del Rosario ("The Penguin Group Defendants") filed this Motion to Dismiss based upon Rule 12(b)(6). Defendant Barnes and Noble joins this motion. Defendants' counsel note that Raymond Pingitore and Paul Lonardo do not join this motion as the Plaintiff has yet to serve them.
Plaintiff has timely filed an objection to the Motion to Dismiss. *Page 5 
 II. STANDARD OF REVIEW
Motion to Dismiss for Failure to State a Claim Upon WhichRelief Can be Granted Rule 12(b)(6)
"[T]he sole function of a motion to dismiss is to test the sufficiency of the complaint." Barrette v. Yakavonis,966 A.2d 1231, 1234 (R.I. 2009) (quoting Palazzo v. Alves,944 A.2d 144, 149 (R.I. 2008). "`The grant of a Rule 12(b)(6) motion to dismiss is appropriate when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim."' Id. (quoting Palazzo,944 A.2d at 149-150). In conducting this analysis, a trial justice should assume all the allegations in plaintiff's complaint to be true, and view them in the light most favorable to the plaintiff.Palazzo, 944 A.2d at 149 (citing Ellis v. Rhode IslandPublic Transit Authority, 586 A.2d 1055, 1057 (R.I. 1991)).
 III. ANALYSIS
In analyzing this motion this Court will utilize the standard of review described above with regard to the requirements set out by § 9-1-28. The Court will also examine the current state of G.L. § 12-25.1-3 which deals with the issue of criminal royalties. In researching the law surrounding this motion and the Plaintiff's claim the Court discovered the unique status that G.L. § 12-25.1-3 holds and would be remiss if it did not take the opportunity to address it in a case such as this. *Page 6 
 A. § 9-1-28: Action for Unauthorized Use of Name, Portrait, or Picture
Plaintiff brings his original complaint alleging that he is owed relief under Section 9-1-28 of the General Laws of Rhode Island. G.L. § 9-1-28 states, in part:
 Any person whose name, portrait, or picture is used within the state or advertising purposes or for the purposes of trade without his or her written consent may bring an action in the superior court against the person so using his or her name, portrait, or picture to prevent and restrain the use thereof, and may recover damages for any injuries sustained by reason of such use.
Furthermore, in the `Notes to Decisions' associated with § 9-1-28, the following language states:
 1. BURDEN OF PROOF
 To make out a violation of this Section, the plaintiff must prove three distinct elements: (1) Use of his name, portrait or picture, (2) without written permission, (3) for advertising or trade purposes. Mendonsa v. Time Inc., 678 F. Supp. 967 (D.R.I. 1988).
To date, Mendonsa v. Time Inc., has been the seminal point of law in cases dealing with § 9-1-28. (This case centered around the use of the famous photograph `The Kissing Sailor' taken in Times Square shortly after it was announced that World War II was over.) In its decision, the Mendonsa Court enters into an in depth and very clear analysis of the statute and its proper interpretation. Following a brief history of the development of the right to privacy, (which is what § 9-1-28 protects) theMendonsa Court narrows its view and focuses on how this right has developed in Rhode Island. This history provides clear direction regarding where to seek guidance and clarification in matters pertaining to § 9-1-28. *Page 7 
In 1909, following the decision announced in Henry v.Cherry Webb, 73 A.97 (1909), the Rhode Island Supreme Court held that there was no common law right to privacy in Rhode Island.Mendonsa, 678 F. Supp. at 970. The Court reasoned that when the plaintiff suffered great ridicule and mental anguish after his image was placed in an advertisement without his knowledge or consent there was no common law relief available. Id.
Furthermore, the development of such relief should come through the actions of the legislature, not the courts. Id. This remained the status quo until 1972 when the United States District Court for the District of Rhode Island did not recognize an invasion of privacy in Gravina v. Brunswick Corp.,338 F. Supp. 1 (D. R.I. 1972). Id. Citing the Henry Court's holding, the Gravina Court held that there was no right of privacy at common law and it went on to declare:
 The Henry Court left it to the legislature to provide for an actionable right of privacy if it is so desired. To this date the legislature has not shown any such desire, and Henry stands as the only existing Rhode Island authority on the right of privacy. Gravina, 338 F. Supp. at 2-3.
Following this pronouncement, the Rhode Island General Assembly recognized the right to privacy by enacting R.I.G.L. § 9-1-28 three months later. Mendonsa,678 F. Supp. at 970. In describing this series of events, theMendonsa Court pays particular attention to the fact that the R.I.G.L. § 9-1-28 is modeled after Section 51 of the New York Civ. Rights Law and limits "`this right only to protection against the unauthorized use of a name, portrait or picture for commercial advantage"' Id. (citing Kalian v. People ActingThrough Community Effort, Inc., 409 A.2d 608 (1979)). *Page 8 
In its analysis the Mendonsa Court announces the requirements the Plaintiff must establish in order to successfully prove a violation of § 9-1-28:
 (1) Use of his name, portrait or picture;
 (2) without written permission;
 (3) for advertising or trade purposes. Mendonsa, 678 F. Supp. at 971.
In this instance, it is clear that Plaintiff has satisfied the first two requirements of § 9-1-28. He has not given written permission, or any other permission, for his name, portrait or picture to be used in conjunction with the production of Thrill Killers. (Complaint at ¶ 23, 29, 35, 37, 42, 45, 47, 50, 52, 61, 63, 65, 67, 70). The Court will therefore deem these two elements satisfied and proceed to the third and final element required by statute.
Rhode Island General Law § 9-1-28 does not define "advertising or trade purposes." However, once again the Court turns to the path created by Mendonsa and finds this guidance:
 In construing that phrase, the Rhode Island Supreme Court would, in all probability, look to the large body of New York Law interpreting similar language in Section 51 of the New York Civil Rights Law after which Section 9-1-28 is clearly modeled. Mendonsa, 678 F. Supp. at 971 (citing Laliberte v. Providence Redevelopment Agency, 288 A.2d 502 (1972)).
The law surrounding New York Civ. Rights Law, Section 51 offers an excellent picture of the analytical process used to determine whether a piece of work has been sued for "advertising or trade purposes." The Court of Appeals of New York makes it very clear that in "recognizing the Legislature's pointed objective in enacting Sections 50 and 51, we have underscored that the statute is to be narrowly construed and `strictly limited to *Page 9 
non-consensual commercial appropriations of the name, portrait or picture of a living person." Messenger v. Gruner + JahrPrinting Publishing, 727 N.E.2.d 549, 552 (N.Y. 2000) (citingFinger v. Omnibus Publs. Intl., 77 N.Y.2.d 138, 141-142).
The Supreme Court of New York published an opinion that offers exceptional direction on all aspects of this issue. InKoussevitzky v. Allen, Towne Heath, Inc.68 N.Y.S.2d 779, 782 (N.Y. 1947), which revolved around the publication of an unauthorized biography of a famous symphony conductor, the court recognizes the diametric opposition between the tendency "to protect `the inviolate personality" and "to keep the avenues of news and of the dissemination of information free and unimpeded." (citing Warren and Brandeis on The Right to Privacy, 4 Harv. L. Rev. 193, 214). The court further observes that, in dealing with this legal issue, other courts have allowed for a very broad scope of the term "dissemination of information".Id. The Koussevitzky Court makes note of the fact that from the inception of the statute, no right to privacy was awarded to news or current events, or those individuals who were the subjects of such reports. Id. at 782. These individuals were recognized to have "renounced to live their lives screened from public observation" due to their public actions which make them the "subject of legitimate interest to their fellow citizens."Id. In a statement directly applicable to Plaintiff's claim, and his inclusion of the standard definitions of these terms in his claim, the Koussevitzky Court illustrates the interpretation of the phrase "for advertising purposes, or for the purposes of free trade":
 A literal construction of these words would have resulted in seriously hampering freedom of speech and of the press. All publications presumably are operated for profit and articles contained therein are used with a view to increasing circulation. Accordingly, emphasis was laid on *Page 10 
the nature of the article, and of these use of the name or picture, and whether they were of public interest, rather than on the element of profit. Id. at 783.
Subsequent New York courts have followed this guidance and noted that, "neither does the fact that a writer or publisher has a profit motive or a motive to increase circulation by using the name of a private citizen violate the trade purposes prong of New York Civ. Rights Law provided the content is informative or newsworthy." Herink v.Harper Row Publishers, Inc. and Pinchot,607 F. Supp. 657, 660 (NY 1985) (citingPagan v. New York Herald Tribune,32 A.D2d 342, 343 (1st Dep't. 1969), aff'd 258 N.E.2d 727 (1970)). In Herink, the court was faced with a plaintiff who complained that he had suffered damage by being included as an example of how to succeed in the defendant's book. Plaintiff had apparently been extremely successful in his position at IBM and had been an "aggressive and creative builder of an internal educational empire within IBM." Id. at 658.
Like the world famous conductor in Koussevitzky, Plaintiff in this case has gained public notoriety through the actions described at the outset of this opinion. Through his own choices and actions he has thrust himself into the public conscience and garnered attention for his crimes. Like the plaintiff inHerink, he is now a figure of public interest and people find information about him, such as the information contained in the book at issue here, to be newsworthy and informative.
It seems clear that where publications promote the public dissemination of information that is newsworthy or of interest to the public the application of in regards to the subject of such publications N.Y. Civ. Rights Law, Section 51 or R.I.G.L. § 9-1-28 in regards to the subjects of such publications is improper. To hold otherwise would be an *Page 11 
affront to the First Amendment guarantee of freedom of speech. It is made clear by definitive precedent, with which this court agrees, that it is simply not the case that the book in question uses the Plaintiff's name, picture or portrait for advertising or trade purposes as required by the third prong of the statute. Therefore the Court finds that, pursuant to the standard of review announced above for a motion to dismiss, the Plaintiff is not entitled to relief from the Defendant under any set of facts and the Defendants' Motion to Dismiss is granted.
 B. R.I. Gen. Law § 12-25.1-3, Criminal RoyaltiesDistribution Act
During the Court's examination of this motion and Plaintiff's subsequent objection, the Court examined what should happen if Plaintiff succeeded in his claim. The research revealed a statute that has an interesting and unique legal status. In order to bring light to this legal issue, the Court will take the opportunity presented here to address the status of R.I. Gen. Laws § 12-25.1-3. This statute addresses the distribution of criminal royalties and follows the rationale behind the well-known "Son of Sam Law" from New York. In essence, the statute seeks to prevent criminals from profiting from the notoriety of their crimes. Under § 12-25.1-3 any monies owed to a criminally responsible person from the commercial exploitation of the events surrounding the crime or alleged crime they committed will be placed in the criminal royalty's fund. The fund will then use the money to pay costs associated with the trial and to compensate the victims' family. It is well known that New York's "Son of Sam Law" was declared unconstitutional by the United States Supreme Court inSimon Schuster, Inc. v. Members of the New York State CrimeVictims Board, 502 U.S. 105 (1991) because of *Page 12 
its overly broad restriction on free speech. Likewise, Rhode Island's Criminal Royalties Distribution Act has been declared unconstitutional by the Supreme Court of Rhode Island. Unlike New York, which subsequently repealed the law and enacted a new version that conformed to the constitutional requirements laid out by the United States Supreme Court, Rhode Island has not yet taken the next step.[2] This inaction is what gives R.I.G.L. § 12-25.1-3 its unique character.
Rhode Island General Law § 12-25.1-3 remains in statute yet it has been declared unconstitutional and therefore cannot be followed or implemented until its constitutional flaws have been addressed.[3]
In Bouchard v. Price, 694 A.2d 670 (R.I. 1997) the Rhode Island Supreme Court, following the rationale of the United States Supreme Court in Simon Schuster, declared R.I.G.L. § 12-25.1-3 to be unconstitutional because it is both overly broad and under-inclusive. Bouchard at 677-8. The result of all this is a law that is technically "on the books", but which is unenforceable due to its unconstitutional nature. While this Court, in this particular set of facts, does not need to reach this issue, there may be other cases in which this statute may become highly relevant. At the same time, this Court recognizes that it is not the province of the judicial branch, but other branches of state government to determine whether this unenforceable statute should be left untouched, amended or repealed to rectify this constitutional issue.
[1] Detective Pingitore was a detective in the Johnston Police Department in 2000 and investigated the murders of Amy Shute and Jason Burgeson.
[2] New York Law Ch. 618, § 10 was replaced with N.Y. Exec. Law § 632-a. The new law applies only to felonious behavior and applies to all profits generated by the crime, not just those generated by expression of the crime, as the previous statute had.
[3] R.I. Gen. Law § 12-25.1-1 states that "the Criminal Royalties Act is unconstitutional; not only is it overbroad. . . .it also suffers from under-inclusiveness."
 *Page 1